**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Louis C. Ludwig
10 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 377-1181
Email: pdahlstrom@pomlaw.com
        lsmollar@pomlaw.com
        lcludwig@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Co-Lead Counsel for Plaintiffs

[*Additional counsel on signature page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONG MIN PARK, Individually and on Behalf of All Others Similarly Situated,<br><br>                                        Plaintiff,<br><br>     vs.<br><br>GOPRO, INC., NICHOLAS D. WOODMAN, CHARLES J. PROBER, and BRIAN T. MCGEE,<br><br>                                        Defendants | Case No. 3:18-cv-00193-EMC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Julie Wiegand and Michael Birlenbach ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoPro, Inc. ("GoPro" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of GoPro ("Confidential Witnesses" or "CWs"), and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of GoPro between November 2, 2017 and January 5, 2018, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     GoPro, Inc. develops and manufactures wearable and gear-mountable cameras along with related accessories.  Its primary product offerings include: HERO5/HERO6, a line of cloud-connected cameras; Karma, a compact drone; and Karma Grip, a handheld and body-mountable camera stabilizer to capture zero-shake and smooth video. GoPro markets and sells its products primarily through retailers and distributors, as well as through its website.

3.     By the beginning of the Class Period, it was clear to Defendants that GoPro had flooded the market with too many substantially similar products – which were also GoPro's largest revenue-generating products, that demand for GoPro's products overall was weak, and that GoPro

would not generate adequate revenues from its newest most important offering, the HERO6, which was the focus of GoPro's 2017 holiday sales campaign and which GoPro anticipated would boost total revenue.  Likewise, sales of GoPro's Karma drone had never taken off following a disastrous launch, embarrassing recall, and unfavorable comparisons to competing drones.  In communications with the public, however, Defendants assured analysts and investors that GoPro was, in all respects, on track to achieve a profitable fourth quarter.  Indeed, former GoPro employees attested to Chief Executive Officer ("CEO") Nicholas D. Woodman ("Woodman")'s propensity for making exaggerated public statements about the Company which were divorced from GoPro's financial reality.

4.     In fact, GoPro's decision to simultaneously offer both (i) its year-old HERO5 camera at its original price point and (ii) the HERO6, an upgraded version of the HERO5 at a substantially higher price point, led to slow sales for both products: consumers passed on purchasing the HERO5 for the same price it had been introduced at late 2016, and what sales did take place cannibalized sales of the HERO6.

5.     Throughout the Class Period, Defendants issued materially false and misleading statements and made material omissions regarding the market for GoPro's products, as well as sales thereof.  Defendants not only failed to disclose to investors problems with camera sales but affirmatively assured the market that demand for its HERO products was growing and that GoPro remained competitive during the crucial holiday season.

6.     As sales lagged due to weak demand in November 2017, several of GoPro's senior executives cashed in with unusually timed stock sales. Defendants Woodman and the Company's Chief Financial Officer ("CFO") Brian T. McGee ("McGee"), collectively sold more than 700,000 shares of personally held stock for gross proceeds of more than $6.5 million. Indeed, the timing of these stock sales was so unusual that Defendant Woodman sent an email to GoPro's employees, attempting to explain these sales.

7.     Confidential witnesses stated that, at all relevant times, GoPro's current sales figures were discussed in weekly meetings and disseminated internally through multiple channels, and

further stated that GoPro suffered from inadequate internal controls: in particular, the Company's data analysis abilities were "crude and simplistic," and that the weakness was known by Defendants Woodman and McGee.

8.      In November 2017, the Company issued guidance that analysts believed was conservative and an "easy beat." However, the market did not know that the guidance was unachievable given the pressures buffeting GoPro. Defendants participated in a conference call on November 1, 2017 in which they misled analysts about these risks and touted the Company's products, as well as its prospects for the fourth quarter of 2017 ("Q4 2017"), despite having direct knowledge of GoPro's true financial condition.

9.      In an attempt to meet its unrealistic Q4 2017 guidance, GoPro resorted to price cuts to move inventory, culminating in the same predictable, deleterious effects on revenue the Company experienced when it tried the same strategy in 2015. By Black Friday 2017, panic was setting in internally at GoPro, where employees scrambled to meet sales targets.

10.     The continued viability of the Karma drone, which also suffered from weak demand throughout 2017, was dependent on GoPro's traditional source of revenue – camera sales – to fund research and development of the next drone model. This, combined with the ongoing failure of GoPro's Karma drone to produce revenue, sealed the fate of GoPro's drone division. During the Class Period, Defendants failed to disclose the precariousness of GoPro's drone operations, despite having promised the SEC in May 2017 that GoPro would apprise the market of "known trends and uncertainties" relating to the Karma.

11.     On Monday January 8, 2018, before the open of trading, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results," revealing that its fourth quarter 2017 sales were $340 million, significantly below analysts' projections of over $470 million. GoPro blamed the results on the slashing of prices for its HERO6 Black, HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter, which the Company had been forced to do to move inventory, and which had a negative $80 million impact on revenues. GoPro also disclosed it was cutting more than one-fifth of its workforce and

exiting the drone market altogether, requiring it to dump the rest of its Karma drone inventory. GoPro had cut the price for its HERO5 Black camera in December 2017, and announced it was now reducing the price of its newly launched HERO6 model to $399 from $499. The workforce reduction would cost GoPro $33 million, mainly in severance costs.

12.     On this news, GoPro stock price declined over 12%, falling from a close of $7.52 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share on an unusually high trading volume of more than 59 million shares traded.  The risk of lower sales and missed revenue forecast had now materialized.

13.     Throughout the Class Period, Defendants made materially false and misleading statements and omitted material statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (i) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (ii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand; (iii) demand for GoPro's Karma drones was weak owing to the bad publicity stemming from a November 2016 recall as well as the Karma's lack of market recognition, which had led the Company to consider a name change for the drone; (iv) the Karma was not profitable; (v) Defendants had access to internal sales, marketing, and product demand data confirming weak demand for and unprofitability of the Karma, and for that reason cited outside sources with respect to the Karma's market share; (vi) the Karma was subject to known trends or uncertainties with respect to research and development expenses, specifically its dependence on GoPro's camera business as precondition to future viability; (vii) GoPro's drone division was jeopardized by demand and pricing problems affecting its camera business; (viii) the marketing initiatives undertaken by GoPro during the Class Period included product discounts that Defendants knew, based on previous experience, had a negative impact on revenue; (ix) its software systems were incapable of properly measuring sales; (x) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and

(xi) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

14.     After the end of the Class Period, Defendant Woodman admitted that GoPro's earnings miss was the direct result of a "domino effect" that began with slow sales of the HERO5 at the same prices at which it had been introduced a year earlier.  Defendant Woodman further admitted that GoPro's own internal data showed that its customers were uninterested in drones.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as substantial acts and transactions giving rise to the violations of law complained of herein occurred in this district. Further, GoPro's principal executive offices are located within this Judicial District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20.     Lead Plaintiffs, as set forth in their certifications previously filed with the Court, collectively purchased GoPro securities at artificially inflated prices during the Class Period and were

damaged upon the disclosure of the true financial state of the Company and materialization of the undisclosed risks.  *See* Dkt. No. 23-2.

21.    Defendant GoPro is incorporated in Delaware, and the Company's principal executive offices are located at 3000 Clearview Way, San Mateo, California 94402.  GoPro's common stock trades on the NASDAQ under the ticker symbol "GPRO."  During the Class Period, GoPro had more than 109 million shares of its Class A common stock issued and outstanding, which shares traded in an efficient market on the NASDAQ. GoPro was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations at investor and analyst conferences. GoPro also filed periodic public reports with the SEC and regularly issued press releases to the financial press.

22.    Defendant Woodman founded and has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.  During the Class Period, Defendant Woodman sold 706,980 shares of GoPro common stock during the Class Period.

23.    Defendant Charles J. Prober ("Prober") has served at all relevant times as the Company's Chief Operating Officer ("COO").

24.    Defendant McGee has served at all relevant times as the Company's Chief Financial Officer ("CFO").  During the Class Period, Defendant McGee sold 7,541 shares of GoPro common stock.

25.    The Defendants referenced above in ¶¶22 - 24 are sometimes referred to herein as the "Individual Defendants."

26.    The Individual Defendants possessed the power and authority to control and did control the contents of GoPro's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were

being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

<div align="center">

**SUBSTANTIVE ALLEGATIONS**

**<u>Background</u>**

</div>

A.      **GoPro's Primary Market Becomes Oversaturated**

27.      Defendant GoPro was founded in 2002 by Defendant Woodman, and was formerly known as "Woodman Labs, Inc." The Company changed its name to "GoPro, Inc." in February 2014. GoPro is headquartered in San Mateo, California, and its stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "GPRO."

28.      GoPro manufactures eponymous action cameras and develops its own mobile apps and video-editing software.  GoPro is synonymous with action cameras, a market the Company pioneered by launching the first commercially available action camera around the time of its founding.  In addition, GoPro has developed video editing software for use in its action cameras.

29.      In late September 2014, GoPro launched two new high-end action cameras: the HERO4 Silver and HERO4 Black.

30.      GoPro launched three low-end to mid-range devices in 2015: the $130 HERO, $200 HERO+, and $300 HERO +LCD.  However, these new cameras cannibalized sales of GoPro's pricier HERO4 Silver and Black cameras.

31.      In July 2015, GoPro launched the HERO4 Session, a compact camera the size of an ice cube.  But unlike the Silver, which also cost $400, the Session lacked an LCD touchscreen and the ability to record 4K video.

32.      GoPro assumed that the HERO4 Session – initially priced at $400 – would complement its premium Silver and Black cameras, but low demand forced the Company to cut the HERO4 Session's price to $300 in September 2015.  That $100 price cut forced the Company to take a $19 million write down, which in turn contributed heavily to GoPro missing the low end of its sales guidance by $30 million. In early December 2015, GoPro cut the price of the HERO4 Session again,

this time to $200.

33.     In early 2016, GoPro discontinued the HERO, HERO+, and HERO+ LCD, then repositioned the $200 Session as its entry-level camera, and announced that 100 jobs would be cut.

34.     On February 4, 2016, GoPro shares declined by more than 10% after it missed earnings by more than 3% and its fourth quarter revenue dropped by 32%.

35.     On November 3, 2016, GoPro's stock price dropped by 20% after revenue came in $72.16 million below expectations.  That same month, GoPro announced production delays to its newest model, the HERO5, causing it to miss holiday sales.  Previously, in October, Amazon had stopped selling the HERO5 due to a pricing squabble with GoPro.

36.     During 2017, GoPro launched two new high-end cameras -- the $500 HERO6 Black and the $700 Hero Fusion, which captures spherical content for interactive and VR ("Virtual Reality") videos.  Customers balked at the HERO 6 Black's $499 price tag, particularly as cheaper versions of earlier HERO models remained on the market.

37.     In December 2017, despite being forced to take write downs to inventory from the 2015 holiday quarter, the Company again offered steep discounts on its flagship products in an attempt to create demand, the HERO6, the HERO5, and the HERO5 Session - 10% off the HERO6, 25% off the HERO5 and 33% off the Session.  The new pricing was $449.99 for the HERO6 Black, $299.99 for the HERO5 Black, and $199.99 for the HERO5 Session.

38.     These price cuts, and the resultant pressure on GoPro's earnings, were tightly interrelated. Following the end of the Class Period, GoPro told investors that when it dropped the HERO5's price on December 10, 2017, it was also forced to cut the price on its new flagship HERO6 Black camera, lowering it from its retail price of $499 to $399.

**B.     GoPro's Disastrous Expansion into the Consumer Drone Market**

39.     GoPro's foray into the drone business – which followed closely on the heels of the HERO4 Session debacle – was intended to distinguish itself from less expensive competitors that had been eating away at the Company's market share for mini action cameras.  Moreover, GoPro designed the Karma as a backwards-compatible accessory for its HERO cameras in a bid to spur

camera demand.  However, this move had the effect of pushing GoPro into an already crowded and competitive drone field dominated by heavyweights like China-based DJI Innovations ("DJI").[1]

40.     When GoPro announced the Karma in late 2015, the drone market was already dominated by DJI.  DJI unveiled the Phantom in 2012, a complete off-the-shelf device that would become the standard for consumer drones.

41.     DJI's early Phantom drones included mounts for GoPro cameras, but DJI started installing its own cameras – which could be remotely controlled – starting with the Phantom 2 Vision+ in 2014.

42.     Realizing that it was being cut out of the lucrative drone market, GoPro, in 2014, unsuccessfully tried to convince DJI to develop a GoPro-branded drone.

43.     In April 2015, 3D Robotics ("3DR") released the "Solo" quadcopter drone, which for the first time allowed professional quality video (with an attached GoPro).

44.     However, the Solo's gimbal, or camera-stabilizing device, faced production delays and the first Solos hit the market without this add-on, making it unsuitable for photos and video, the chief use of most consumer drones.

45.     And while a Solo with a gimbal and GoPro camera cost more than $1,700, the vertically integrated DJI, which controlled its own factories and already sold its comparable Phantom 3 Professional package for $1,300, aggressively slashed prices.

46.     GoPro finally took over the entire development process in mid-2015, shortly after DJI launched the Phantom 3 and put 3DR out of business.

47.     GoPro initially claimed, in late 2015, that its drone, the Karma, would be launched in early 2016.  But in May 2016, GoPro delayed its launch of the Karma until the holiday season, during the fourth quarter of 2016.

48.     Meanwhile, in early March 2016, DJI came out with the Phantom 4, boasting "computer vision" capability and machine learning to track a person, animal, or object on the ground

---

[1] *See* https://gizmodo.com/gopro-loses-two-year-battle-with-the-sky-1821872199.

without simply following a GPS track.

49.    On March 2, 2016, *Fortune* matter-of-factly stated that "GoPro is in need of a spark after a disastrous fourth-quarter of selling its camera."[2]

50.    GoPro finally released the Karma for sale to the market in October 2016.

51.    The Karma could be purchased for $799 without a camera.  However, for another $300, users could add the HERO5 Black camera (that typically cost $399) or, for an additional $200, the HERO5 Session camera (normally $299).  This pricing reflected GoPro's use of the Karma as a vehicle to revive its troubled, flagship camera business. Conversely, as Defendant Woodman admitted at the end of the Class Period, GoPro's upstart drone division was highly dependent, for investment and development, on sales of the Company's more established camera division.

52.    Just days after Karma's release, DJI announced the Mavic Pro, boasting a lower price point than GoPro's Karma, and was far smaller, lighter, more compact, faster, had visual sensors, and a far longer battery life.

53.    Making things even worse, on November 8, 2016, just sixteen days after Karma's release, GoPro issued a recall order for the Karma, encompassing approximately 2,500 units.

54.    To compensate for the recall during the 2016 holiday season, GoPro launched the Karma Grip (a handheld motorized stabilizer for GoPro cameras that was previously part of the Karma drone kit) as a stand-alone device.  But once again, DJI had previously launched a similar handheld stabilizer, the Osmo.  When the recall was announced, GoPro's Karma had been set to go head-to-head with DJI's MavicPro in the marketplace.  As one tech blogger put it at the end of the Class Period, "the Karma never recovered" following the 2016 recall.[3]

55.    Faced with problems related to its flagging camera sales, GoPro rushed the Karma to market without proper testing.  In contrast to DJI, which did not start producing passable drones until five years after the company was founded, GoPro attempted to develop and bring a drone to market in

---

[2] http://fortune.com/2016/03/02/gopro-replay-splice-mobile-apps/

[3] *See* https://dronedj.com/2018/01/08/gopro-to-exit-drone-market-after-selling-remaining-inventory/

just one year.

56.     Nevertheless, Defendant Woodman told *TechCrunch* in January 2017 that the Company was returning to profitability, banking on sales of its new HERO5 camera, and that, citing the strength of GoPro's brand, it would not only continue selling the relaunched Karma drone, but even planned to expand its line of drones.

57.     In May 2017, following the Company's issuance of its fiscal 2016 annual report on Form 10-K, the SEC directed the Company to make more fulsome disclosures about "known trends and uncertainties" impacting its business as required by SEC Rule SK-303, with GoPro pledging to do so, stating in pertinent part as follows:

> [SEC:]  1.  *We note that there have been significant increases in your research and development expenses in recent periods, and that you expect this trend to continue in 2017. Please revise your MD&A to disclose any known trends or uncertainties with respect to your research and development expenses, and discuss if known the anticipated drivers therefor. For example, it appears that certain of your R&D expenditures have related to the resolution of issues related to Karma.*
>
> ***
>
> *We advise the Staff that we intend to continue to review and consider our disclosures regarding known trends and uncertainties in future filings, and include appropriate discussion in MD&A accordingly . . . .*

58.     During the Class Period, Defendants claimed – citing to third party data – that Karma reached the number two market position in its price band.  However, these statements failed to account for the disparity between the number one and two spaces.  GoPro has never released actual numbers on market share with respect to the Karma.

**Confidential Witness Allegations**

**A.     CW1**

59.     Confidential Witness ("CW") 1 was employed in the marketing department at GoPro from February 2015 to July 2017.  As a member of the marketing team, CW1 reported to Michael Kenny ("Kenny"), who was then Director of Marketing; Bryan Johnston ("Johnston"), SVP

of Marketing; and Michael Zoglio, Head of Analytics at varying times throughout CW1's employment. CW1's job duties involved market research, consumer opinions on GoPro products and reactions to marketing campaigns.

### 1. In 2016-17 GoPro was a company in search of a distinct product

60.     During CW1's last few months at the Company, CW1 noted that the general trend of sales had been declining for eighteen (18) months or more.

61.     CW1 stated that the HERO6 (and the HERO5 before that) simply did not offer distinct enough features to separate them from earlier models of the camera and spark sales.

62.     CW1 stated that CW1 and a number of other employees expressed internally at the Company that those products were not going to grow GoPro.

### 2. Circumstances at GoPro differed from the picture presented to the public

63.     CW1 stated that contrary to the Company's statement at the end of Q3 2017 that the demand for GoPro products was strong, CW1 did not consider the demand strong, especially in comparison to the strength of demand the Company once enjoyed based on   CW1's experience during the two-and-a-half years of observing sales trends at GoPro and CW1's understanding as a marketing professional of the way consumer appetites wax and wane for particular products. "I felt consumer appetites were on the wane for GoPro," CW1 said. "People weren't paying close attention to us. We weren't the hot product anymore."

64.     According to CW1, sales were declining during Q3 2017, and had been for well over a year-and-a-half.  In particular, by time CW1 left GoPro in July 2017, the Company was aware that the Karma was no longer competitive with DJI's drones, and that the Karma was not selling. CW1 said it was internally-known at GoPro that the Company had missed its window of opportunity to get a foothold in the drone market when the 2016 launch of the Karma was mired with recalls and subsequent engineering efforts to fix the problem.

65.     CW1 stated that Defendant Woodman had a tendency during investor calls to speak highly of the Company's prospects despite sales trends showing otherwise.

**3.  Defendants Woodman and McGee knew of the true state of affairs at GoPro**

66.  Once a week, staff in GoPro's marketing department met to discuss ongoing efforts and future plans with high-level executives.  CW1 attended most of these meetings.

67.  CW1 said that Defendant Woodman also attended most of these meetings, while Defendant McGee attended some of these meetings.

68.  At these meetings, GoPro's marketing staff would report to Defendant Woodman about existing marketing efforts, proposed marketing campaigns and how consumers responded to different types of messaging.

69.  In addition, CW1 stated that GoPro had an internal system in place that was continuously updated with sales numbers.

**B.  CW2**

70.  CW2 was Director of Marketing for Latin America at GoPro from July 2015 to May 2017.

71.   CW2 initially reported to Johnston, SVP of Marketing, who was let go by the Company in late 2016.

72.  After Johnston left, CW2 reported to Kenny, who was let go by the Company in early 2017.

**1.  GoPro was unable to upgrade its existing products to generate market interest**

73.  Before CW2 left GoPro in May 2017, CW2 was aware of the technological features that would be part of the HERO6 when it launched later that year.

74.  With respect to the HERO6, CW2 stated that the camera's technology was not a game-changer and that it was unreasonable to presume it would cause demand to spike.

75.  CW2 stated that employees were aware that the features on the HERO6 would not be enough to motivate GoPro users to upgrade from older models and/or choose the more expensive HERO6, prompting the realization that the HERO6 would not meet sales projections.

**2.  The Karma was plagued by a lack of market recognition**

76.  CW2 recalled that before the relaunch of the Karma in early 2017, the Company had

internal discussions about whether they should change the name of the drone due to the bad publicity regarding the recall.

77.     Ultimately, the Company decided against the name change because market recognition of the product was so low that not enough people knew GoPro had a drone called Karma to warrant a name change.

78.     CW2 characterized the Company's statements that there was strong demand for the Karma in 2017 as completely illogical based on the product's lack of name recognition (which was known internally), as well as the fact that what name recognition the Karma did have was linked to the earlier recall.

**3.     GoPro products suffered from weak demand in late 2017**

79.     CW2 stated that demand for GoPro's products was weak in 2017. The Company's public statements that there was strong demand for GoPro's products in late 2017 were false or misleading when made.

80.     CW2 stated that Defendants Woodman and McGee attended regular meetings at which they were provided with current sales and marketing information.

**C.     CW3**

81.     CW3 was a Channel Marketing Events Specialist at GoPro from April 2015 to January 2018, and was responsible for working with the Company's sales representatives along with U.S. retailers and business partners to set up promotional events for GoPro products.

82.     CW3 reported up through GoPro's sales department.

**1.     Defendants closely tracked product demand and sales numbers**

83.     CW3 explained that GoPro kept close tabs on sales and consumer demand for its products through internal computer database systems that tracked all sales.   These reports were broken down into "very detailed" categories.

84.     In addition, GoPro received reports from large-scale retailers who would visit the Company to disclose what was going on in market.

1

### 2. Defendant Woodman met with his sales leaders weekly

85.     Corroborating CWs 1 and 2, CW3 stated that that Woodman met with his sales leaders weekly to discuss numbers.

86.     CW3 also noted that Woodman was deeply involved in the business and had a very hands-on approach.

87.     CW3 stated that the head of sales and the head of channels attended the meetings with Woodman along with their direct reports.

88.     CW3 said the Company sales team was divided into regions (with seven regional sales managers), the international group, and also categories, such as big box stores, mid-size retailers and specialty markets.

### 3. GoPro's lackluster Black Friday 2017 confirmed its market weakness

89.     CW3 stated that sales results for Black Friday 2017 provided confirmation that GoPro was far off track for its sales targets.

90.     CW3 identified the HERO6'S $499 price tag – which was too high to attract the expected buyers – as a primary reason underlying the sales shortfall.

91.     CW3 explained that typically, in the tech industry, when an upgraded version of a product is launched, the new model is priced near where the older model had been priced.  At the same time, the older model's price is dropped significantly.  GoPro did not do that when it launched the HERO6.  Rather, the Company kept the HERO5 priced at $399 and set the HERO6's price at $499.

92.     Moreover, CW3 revealed that the entire executive team, including Defendant Woodman, made the decision to set the pricing for the HERO6 launch, which followed a pattern of overpricing dating back to the HERO5 Session.

93.     In what CW3 described as "scrambling,'" and "trying to make up for their mistake" after the disastrous Black Friday sales results, GoPro immediately called every retailer in the world to inform them of pricing and discount changes.

94.     Then, the Company pulled back its instant rebates, which they had determined were not incentive enough to drive customers to buy the HERO6.

95.     Very shortly after that, prices were slashed for the HERO6, HERO5 and HERO5 Session.

96.     The Company also pulled discounts it had offered to some retailers. The sales team had to send out hundreds of thousands of letters to retailers about the changes.

97.     CW3 stated that far-lower-than-expected sales trends were known at the Company.

98.     CW3 recalled that GoPro's sales team was asked to prepare sales reports from all retailers within a few days of Black Friday, and those reports were submitted to higher managers at GoPro.

99.     Nevertheless, many retailers were upset about the pricing changes and some told sales staff to retrieve their GoPro displays because these retailers were ending the business relationship with GoPro.

**D.     CW4**

100.     CW4 was an Inventory Analyst from June 2015 to June 2016 on temporary contract at GoPro.  CW4 was then brought back on temporary contract as Operations Forecast Coordinator from October 2016 to December 29, 2017.  During CW4's second term at GoPro in 2016-2017, CW4 reported to GoPro's Director of Operations. CW4's manager reported to the Senior Director of Operations, who reported to the VP of Operations, who reported to Defendant Woodman.

101.     CW4's job involved coordinating the distribution of GoPro product accessories to various retailers and distribution warehouses.

102.     When CW4 first began working at GoPro in June 2016, CW4 became aware that the Company was planning to implement a new inventory distribution software system.  At that time, all purchase orders, logistics, sales revenue data, and other information was processed through NetSuite.

103.     The new software, Kinaxis, was supposed to be integrated with NetSuite in the summer of 2016. The Company then planned for the Kinaxis system to be in use by October 2016, but the process was delayed a year.

1   104.   CW4 stated that Kinaxis was incompatible with NetSuite, and that GoPro was still

2   working out some of the incompatibilities even after Kinaxis was installed in or around October

3   2017.

4   **E.   CW5**

5   105.   CW5 was a Senior Data Analytics Engineer at GoPro from August 2016 to June 2018.

6   CW5 reported to Chester Chen, Senior Manager of Data Science Engineering.

7   106.   CW5's specialty was machine learning.   CW5 possesses a background in IT and

8   software engineering, experience in pattern recognition and statistics, and a Ph.D. in computer

9   engineering.

10   107.   CW5 acted as liaison between data engineers and data analysts by taking raw data and

11   writing software code to aggregate it.

12   108.   CW5 explained that data engineers pulled raw online sales data from the Company's

13   operations database, NetSuite, and transferred the data into local systems for analysis.  Data analysts,

14   in turn, needed to use that data to make forecasts and draw other conclusions about sales.  But before

15   the analysts could make sense of the data, CW5 translated it into more digestible quantities for them.

16   109.   The data CW5 wrote code to aggregate was ultimately used to forecast sales for GoPro

17   products.

18   **1. GoPro's method of forecasting sales and demand was crude and simplistic**

19   110.   CW5 said that GoPro was using Excel spreadsheets and sometimes incomplete data to

20   forecast sales.

21   111.   CW5 described GoPro's internal system for forecasting sales as "crude and

22   simplistic," and said the Company used simple methodologies, such as a linear regression equation

23   from an Excel spreadsheet, to forecast sales.

24   112.   In addition, CW5 stated that GoPro's data collection and the accuracy of their data had

25   a massive impact on the accuracy of the forecast, stating "same garbage in, garbage out."

26   **2. Woodman and McGee were aware that GoPro's analysis was crude and simplistic**

27   113.   CW5 confirmed that Defendants Woodman and McGee were aware that GoPro's sales

28

forecasts were the product of "crude and simplistic analysis."

114.    CW5 noted that Defendants Woodman and McGee were presented reports from manual Excel spreadsheets that were generally used to project future sales.

115.    Further, CW5 attended numerous meetings at GoPro in which other employees expressed frustration with the Company's poor data analysis system.  CW5 said data analysts had been raising their concerns to Company leadership about the system for more than a year.

### 3. Amazon and Best Buy provided significantly delayed sales reports to GoPro

116.    In addition, CW5 noted that the Company often did not have complete sales numbers to analyze.  CW 5 stated that sales information from Amazon and Best Buy was not reported through the NetSuite database at GoPro.  Rather, sales numbers from Amazon and Best Buy came in as PDF reports or emails from the retailers.

117.    GoPro sales data from Amazon and Best Buy were also significantly delayed, meaning the Company did not know how those markets were reacting to products and marketing campaigns until weeks later.

118.    When forecasting sales, CW5 said GoPro did not know what the current demand was on Amazon or Best Buy.

### Insider Sales

119.    On November 3, 2017, Defendant Woodman sold 515,000 GoPro shares.  Just three days later, on November 6, 2017, Defendant Woodman sold 165,343 GoPro shares.  The next day, Defendant Woodman 26,637 GoPro shares.  Between November 3, 2017 and November 7, 2017, Defendant Woodman sold 706,980 of his personally held GoPro shares at between $9.00 and $9.30 per share, reaping $6,520,627 in gross proceeds.  These were his only stock sales during the Class Period and occurred immediately following his false statements regarding demand for the Company's products and unachievable forecasting, and just a few months before GoPro disclosed the true state of the Company's financials.  Defendant Woodman did not sell any GoPro shares prior to the start of the Class Period.

120.   On November 16, 2017, Defendant McGee sold 7,541 GoPro shares at $8.27 per share, for a total of $62,364.07, which represented nearly 10% of his holdings at the time.   These were his only stock sales during the Class Period.  He did not sell any GoPro shares prior to the start of the Class Period.

121.   The timing of these stock sales was so unusual that Defendant Woodman sent an email to GoPro's employees, in which Woodman stated, in relevant part:



Hey GoPro,

I want to brief you on a personal matter: my 10b5-1 stock sales plan has started selling some of my shares and it's likely that this will generate some speculation in the media. I want to make sure that you all get the facts directly from me.

**What's Going On?**  My 10b5-1 stock plan was set up a while ago to automatically sell shares for me when certain criteria are met. *It's now kicking in for the first time.*

**Why Sell?** *I haven't sold any stock for the past three years.* Both common sense and my financial advisors tell me that I need to diversify some of my ownership in GoPro into other things.  I've put this off for a very long time but I have to acknowledge it's not very smart of me to have so many eggs in one basket.

My 10b5-1 plan is entirely financial and has nothing to do with my excitement for our future.  *As those of you who work directly with me know, I literally cannot wait for all the new products and advancements we've got lined up for 2018 and beyond.  We're the best team we've ever been, we're putting out our best products ever and I only see this being more the case moving forward.  I'm so excited for our future 'cause we're going to rock it*!!!!

Thanks for understanding and, if there is any public reaction to the sales, I apologize for this distraction!

Hi5 - Nick

122.   When the communication reproduced in ¶121 above was leaked to the market on November 8, 2017, shares dropped by 2.37%.

**Materially False and Misleading Statements Issued During the Class Period**

123.   On November 1, 2017, GoPro issued a press release filed on Form 8-K with the SEC entitled "GoPro Announces Third Quarter 2017 Results," announcing the financial results for the

period ended September 30, 2017 (the Third Quarter or "Q3") and providing Q4 2017 and updated fiscal 2017 guidance.  The release also highlighted that *"[a]verage sales price (ASP) increased by 22% year-over-year and 3% sequentially . . . driven by the strong performance of the premium-priced HERO6,"* that *"HERO6 Black launched on September 28 . . . with strong sales execution and a 93% channel fill rate at retail,"* that *"[p]rior to the HERO6 launch, HERO5 Black was the best-selling digital image camera in the U.S. for four straight quarters – holding that chart position since its launch in 2016, according to The NPD Group's Retail Tracking Service,"* and that *"GoPro's drone, Karma, was the #2 selling drone in the U.S. priced $1,000 and above during the six months ending September 2017, according to the NPD Group's Retail Tracking Service."* The release also quoted Defendant Woodman as lauding the Company's purportedly ongoing strong business metrics and financial prospects – and return to profitability – stating in pertinent part as follows:

> "*GoPro has turned a corner, restoring growth and profitability to our business* . . .

> "During the quarter we generated $47 million in cash and gross margins were 40 percent. Year-over-year, we grew revenue by 37 percent and dramatically reduced operating costs without impacting our product roadmap. We launched our premium-priced HERO6 Black *with global on-shelf availability and strong critical acclaim. We are now focused on driving consumer demand to reach our goal of full-year double-digit revenue growth and non-GAAP profitability*."

[Emphasis added.]

124.    The statements referenced in ¶123 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (ii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand; (iii) demand for GoPro's Karma drones was weak given the bad publicity stemming from the recall as well as the Karma's lack of market recognition that had led the Company to consider a

name change for the drone; (iv) the Karma was not profitable; (v) the Karma was subject to known trends or uncertainties with respect to research and development expenses, specifically its dependence on GoPro's camera business as precondition to future viability; (vi) GoPro's drone division was jeopardized by demand and pricing problems affecting its camera sales; (vii) GoPro had not "turned a corner" or "restored growth and profitability to [its] business" given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products; (viii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (ix) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

125.    The press release also provided the following Q4 2017 and updated fiscal 2017 false and misleading financial guidance:

> **Business Outlook**
>
> GoPro is providing the following guidance:
>
> - Fourth Quarter 2017
>   - ***Revenue of $470 million +/- $10 million***
>   - GAAP and Non-GAAP gross margin of 41.5% +/- 50 basis points
>   - GAAP operating expenses of $149 million +/- $1 million
>   - Non-GAAP operating expenses of $130 million +/- $1 million
>   - GAAP EPS ["***Earnings per share***"] to be between $0.25 and $0.35
>   - Non-GAAP EPS to be between $0.37 and $0.47
>
> - Full Year 2017
>   - ***Revenue of $1.315 billion +/- $10 million***
>   - GAAP operating expenses below $570 million
>   - Non-GAAP operating expenses below $490 million
>   - GAAP EPS to be between $(0.65) and $(0.55)
>   - Non-GAAP EPS to be between $(0.02) to $0.08

(Emphasis added.)

126.    The statements referenced in ¶125 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly

disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (ii) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

127.    On that same day, Defendants held a conference call with investors and analysts (the "Q3 2017 Earnings Call"), providing additional positive commentary about the Company's then-present business metrics and financial prospects.

128.    During the Q3 2017 Earnings Call, Defendant Woodman stated that:

*Initial sales of our premium-priced HERO6 Black are solid*. Following the HERO6 launch, demand for our legacy product, HERO5 Black, was lighter than expected *but is beginning to benefit from a series of marketing initiatives engineered to drive demand during the holiday season.* And following a mid-year price adjustment, *demand for GoPro's entry-level Session camera was much higher than anticipated and will result in a sooner than expected end-of-life for this product*. This limits our inventory at the entry-level price point during the quarter, but it identifies a significant opportunity for us to expand our market with a new entry-level product slated for 2018. *In the meantime, our guidance reflects promotional programs and special edition SKUs that we believe will get us to our target*.

….

*We are now focused on driving consumer demand and sell-through of our premium products to achieve our goal of full year non-GAAP profitability and exit the year with responsible inventory levels*.  (Emphasis added.)

129.    The statements referenced in ¶¶127-128 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (ii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer

demand; (iii) demand for the HERO6 Black was weak, largely due to its high price tag; (iv) the "marketing initiatives" cited by Defendant Woodman at no time benefitted the HERO5 Black, a holdover item from 2016 with generally weak demand; (v) the "marketing initiatives" cited by Defendant Woodman included lower prices that Defendants knew, based on previous experience, had a negative impact on revenue; (vi) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (vii) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

130.    On the same call, Defendant Prober stated that the Company's priorities were "leading to strong execution and results and we've reestablished GoPro's business as growing and profitable." Defendant Prober further stated that:

> Our paid campaigns for the holiday quarter, which focuses on HERO6 … is now in full swing. Another important metric we track is the number of HERO6 purchasers who are upgrading from a previous generation GoPro. Internal data from our applications show that approximately 30% of those who purchased HERO6 in the first three weeks following launch also owned either a HERO4 or HERO5. If you include all GoPro models, we believe the percentage of upgraders to be higher. ***We're excited about this healthy mix of new users and upgraders***. [Emphasis added.]

131.    The statements referenced in ¶130 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants' priorities had not led to strong execution and results and Defendants had not "reestablished GoPro's business as growing and profitable" given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products; (ii) demand for the HERO6 was weak, largely due to its high price tag, a fact that was confirmed when GoPro slashed prices on the HERO6; (iii) customers were not responsive to GoPro's incremental upgrades, which prompted the Company to slash prices on its flagship camera

products in late 2017; and (iv) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

132.   Also on the 2017 Q3 Earnings Call, Defendant McGee stated:

*We expect revenue for 2017 to be between $1.305 billion and $1.325 billion, which is double-digit growth of between 10% and 12% over 2016. We expect fourth quarter gross margins to be 41.5%, plus or minus 50 basis points, which puts annual margins between 38% and 39%.*

*Gross margins are trending up to 41% in the second half of 2017 due to our improved product offerings.*

....

*Our expected results for 2017 are in line or better than the goals that were established at the beginning of the year; double-digit revenue growth, operating expense reduction, and a return to non-GAAP profitability. We're also pleased that our revenue split between Q3 and Q4 is much better than in prior years.* As we look ahead, *we will continue to drive operating efficiencies across the business with a focus on improved profitability and cash generation.* As discussed last quarter, *our operational improvements related to the launch of HERO6 drove third quarter performance and we have intentionally constrained inventory purchases in order to both enable double-digit revenue growth and to exit 2017 with low inventory.* Careful stewardship of our business during the holiday quarter positions GoPro for continued success in 2018. [Emphasis added.]

133.   The statements referenced in ¶132 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) demand for the HERO6 Black was weak, largely due to its high price tag; (ii) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (iii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand; (iv) Defendants' marketing approach was not "deliberately constrained", but instead reflected the aforementioned lack of demand; (v) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly

turned a blind eye to these issues; and (vi) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

134.    During the Question-and-Answer portion of the Q3 2017 Earnings Call, Defendant Woodman had the following exchange with Paul Coster ("Coster") of JP Morgan:

> **<Q - Paul Coster>**: …. The initial outlook for 2018 looks pretty good. The fourth quarter's though a little complicated, maybe a little difficult to understand. *It sounds like you have HERO5 inventory – excess inventory in the channel and you want to get rid of it. At the same time you're looking to sustain this margin improvement. I'm just wondering what the trick is for sort of flushing that inventory out and entering 1Q with the right mix in the channel*.

> **<A - Nicholas Woodman>**: Hi, Paul. Nick here. Yeah, thanks. *We're actually feeling really good about our guidance for Q4. We're really excited about how the year's turning out and that – as Brian noted, we're either meeting or exceeding most of the metrics that we laid out at the beginning of the year, of course most notably double-digit revenue growth and profitability, profitability coming a little bit earlier than anybody expected in Q3, which is a solid win for the team. So I'd just like to acknowledge that*.

> And then as it relates to HERO5 Black, it's not that we've got a bunch of inventory in the channel and we're trying to clear it at all. Sorry, if that came across as confusing. *It's just that, as to be expected, there's a bit of softness in HERO5 sell-through post-HERO6 launch. And while that's to be expected given that the launch was totally dedicated to HERO6, and HERO6 ended up stealing HERO5's thunder, we think that we're going to be able to drive a substantial demand for HERO5 as promotional programs kick in this month*. The holiday season hasn't really started yet. It doesn't really begin in earnest until mid-November through Christmas. *And with the dedicated promotional programs that we have planned for HERO5 Black, we feel good about driving demand for that product and its contribution to our growth and profitability targets for the quarter*. So overall, we're feeling good and we didn't mean to muddy the message at all.
> So sorry for that.  [Emphasis added.]

135.    In response to a follow up question by Coster, Defendant Woodman stated as follows:

> …. our goal is to enter 2018 with a bang. I don't think that we're approaching the business in an overly conservative manner. I think that we've got very clear goals for 2018, which is to continue double-digit growth and profitability for 2018 as well. We're, as we previewed a bit, we're excited about our new product roadmap for 2018, several new products planned. And I believe it's just a terrific continuation of the innovation and the focus on simplifying the consumer experience that has restored growth to GoPro this year. *So overall, we're feeling really good about the job done in turning the company*

*around this year and how it sets us up well for 2018, starting with our entry into Q1, thanks to our responsible management of Q4*. [Emphasis added.]

136.    The statements referenced in ¶¶134-135 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the HERO5 was not experiencing "a bit of softness", but was a holdover item from 2016 with generally weak demand; (ii) demand for the HERO6 was weak as well, mainly due to its high price tag, a fact that was confirmed when GoPro slashed prices on the HERO6; (iii) the "dedicated promotional programs" cited by Defendant Woodman included lower prices that Defendants knew, based on previous experience, had a negative impact on revenue; (iv) Defendants had not "turned the company around" in 2017 given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products; (v) for these reasons, Defendants' management of Q4 had not been "responsible"; (vi) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and  (vii) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

137.    Also during the Question-and-Answer portion of the Q3 2017 Earnings Call, Defendant McGee had the following exchange with Joe Wittine ("Wittine") of Longbow Research:

 **<Q - Joe H. Wittine>**: Hey, thanks. Can you share with us some quant on how much you expect camera ASPs [Average Sales Price] to increase as the new mix is fully out in the wilds, let's say compared to calendar 2017's mix?

**<A - Brian McGee>**: Yeah. Hi, Joe, this is Brian. As we've said, well, Q3 was $288, so that was up 22% year-over-year. *We expect Q4 actually to be close to $300 on ASP which would be a record. And if I look from 2017 to 2018, there would be somewhere between 2% to 5% growth in ASP based on the roadmap we're seeing*. [Emphasis added.]

138.    The statements referenced in ¶137 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the

Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) Q4 2017 guidance was directly at odds with internally known facts with respect to market recognition, product sales, and product demand, particularly as the contemporaneous lack of demand and lack of market recognition would soon manifest themselves in steep discounts to GoPro products; (ii) Defendants had no basis to assume record ASPs for GoPro cameras given weak demand and market saturation exerting downward pressure on ASP for those products; and (iii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues.

139.    At this point, Wittine asked a follow-up question that was answered by Defendant Prober:

> **<Q - Joe H. Wittine>**: Got it. And then on HERO Session, I mean we saw the inventory evaporation over the last couple of weeks. So the first part is, did that also have a negative impact on the fourth quarter guide? And secondarily, what is the holiday strategy for the sub-$300 price point? Last year, you had the strategy of being pretty active there with the discontinued cameras. I assume you're not going to do that this year, but are you content with standing pat at $299 as the low point? Thank you.

> **<A - Charles Prober>**: Yeah. Hey, Joe, it's CJ. It's a great question. ***The good news is that with the entry-level price move on Session, we've shown that there's a real market at that price point. As we said on the call in 2018, we've got a new product to address that entry-level which we're even more excited about than Session because it's an even better form factor for that price point. So on the positive side, we see great opportunity at that price point. Our guidance for this quarter reflects promotional programs, special edition SKUs and plans to bridge the gap between where we are today and that next product.*** [Emphasis added.]

140.    The statements referenced in ¶139 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants would not "stand pat at $299 as the low point", as Defendant Prober's response indicated, but planned to reduce the price of the Session further, to $199; (ii) Defendants' "entry-level price move" had reduced the costs of their products to the point of unprofitability; (iii)

Defendants' Q4 2017 guidance did not reflect promotional programs that – as Defendants knew – would reduce the Company's earnings; (iv) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (v) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

141.     During the Question-and-Answer portion of the Q3 2017 Earnings Call, Defendant McGee fielded a call from Yuuji Anderson of Morgan Stanley:

> **<Q - Yuuji Anderson**>: Great, thanks for taking my question. I was hoping if we could get some additional color on HERO6 sell-through. Is there a way to kind of compare this to, say, what you saw with the HERO4 Black? I believe that was your other $499 product. Is there any comparison there?

> **<A - Brian McGee**>: There's some. *Actually, from a percentage perspective, the HERO6 Black is doing substantially better than the HERO4 Black. Out the gates, HERO4 Black was about 20%, selling about 16% of sell-through in the fourth quarter of 2014 and we're seeing substantially better than that on the HERO6 Black.* [Emphasis added.]

142.     The statements referenced in ¶141 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) demand for the HERO6 Black was weak, largely due to its high price tag; (ii) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (iii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand; (iv) Defendants' direct comparison of the HERO4 to the HERO6 failed to account for the market saturation and product cannibalization unique to the HERO6 and negatively affecting sell-through; (v) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and

(vi) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

143.     Additionally during the Question-and-Answer portion of the Q3 2017 Earnings Call, Defendant Woodman responded to a query from Stanley Kovler of Citi regarding bringing "a potentially higher margin product to market" as follows:

> **<A - Nicholas Woodman>**: *We're still seeing a lot of strength in the $1,000 range price band for drones. And as we've shared in the past, GoPro's Karma drone is the number two best-selling drone in North America in the $1,000 and above price point. And I think when we first shared that we were high-teens, and we've actually grown share since then. So, Karma is serving as a terrific platform for us as we further our own capabilities and value proposition for consumers with our next generation drone offerings. And the consumer feedback to Karma specifically, actual owners of Karma, has been quite good. And so we're feeling really good about our prospects in the future there.* [Emphasis added.]

144.     The statements referenced in ¶143 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) demand for GoPro's Karma drones was weak given the bad publicity stemming from the recall as well as the Karma's lack of market recognition that had led the Company to consider a name change for the drone; (ii) the Karma was not profitable; (iii) Defendants had access to internal sales, marketing, and product demand data confirming weak demand for and unprofitability of the Karma, and for that reason cited outside sources with respect to the Karma's market share; (iv) the Karma was subject to known trends or uncertainties with respect to research and development expenses, specifically its dependence on GoPro's camera business as precondition to future viability; (v) GoPro's drone division was jeopardized by demand and pricing problems affecting its camera sales; (vi) Defendants' marketing approach was not "deliberately constrained", but instead reflected the aforementioned lack of demand; (vii) the possibility that GoPro would have a "next generation of drone offerings" was in jeopardy given that Karma was highly dependent on the

success of GoPro's highly troubled camera division for future investment and development; (viii); Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (ix) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

145.    The Q3 2017 Earnings Call also featured the following exchange between Defendant McGee and Mike Koban of Raymond James:

> **<Q - Mike Koban>**: First of all, I just kind of wanted to make sure I understood the guidance for the fourth quarter. It looks like it's implying kind of a low double-digit decline year-over-year, but I was wondering if you could – I believe last year was a big sell-in year, so I was wondering if you could give us some – a little bit more color on kind of what this implies, or how you think about it as far as Q4 sell-in….

> **<A - Brian McGee>**: Yeah. Mike, this is Brian. The midpoint of the guidance would be down year-over-year in Q4 about 13%, but the fact is, for the whole – we look at the whole year, right? ***So, for the whole year the guidance is up 10% to 12% on revenue growth. And actually the midpoint of our guidance on EPS is, to be profitable. So that's a pretty dramatic turnaround from 2016.*** I think we should kind of point that out. We also were able, because of supply chain and kind of execution in the quarter for Q3, able to get more fill rate of HERO6 Black into Q3: and that pulled from Q4. So in fairness, you kind of have to look at almost the second half kind of together, Q3, Q4 where – and our guidance will be profitable as well on both a GAAP and non-GAAP basis in the fourth quarter and then profitable for the year.

> As far as channel inventories go, we exited the fourth quarter of 2016 with about 14 weeks. And we want to be more like six weeks to eight weeks exiting this year. And so that's a pretty dramatic reduction in sell-in, in the quarter because we had to really work in the first quarter of 2017 to get that inventory move.  [Emphasis added.]

146.    The statements referenced in ¶145 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Q4 2017 guidance was directly at odds with internally known facts with respect to market recognition, product sales, and product demand, particularly as the contemporaneous lack of

demand and lack of market recognition would soon manifest themselves in steep discounts to GoPro products.  In addition, Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues.

147.   Next, in response to a question from Jason Mitchell of Bank of America Merrill Lynch regarding whether GoPro viewed the HERO5 as a bigger volume product versus the HERO6, Defendant McGee stated that "[o]n the HERO5 volume, we expect that product's build to be the largest percentage of what we ship-in and ship-through in Q4."

148.   The statements referenced in ¶147 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the HERO5 was suffering from poor sales and weak demand; (ii) Defendants' plans with respect to ship-in and ship-through of the HERO5 included lower prices that Defendants knew, based on previous experience, had a negative impact on revenue; (iii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (iv) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

149.   Finally, Defendant McGee had the following exchange with Ben Bollin of Cleveland Research during the Q3 2017 Earnings Call:

> **<Q - Ben J. Bollin>**: Thanks for taking the question. Brian, on the commentary on the HERO6 Black, you talked about the sell-in mix being higher. How would you say the initial sell-through read has been for HERO6 Black in the month of October versus the new product in the year ago period? ….
>
> **<A - Brian McGee>**: On the HERO6, well, the HERO5 the sell-through, it's kind of hard to compare, because one is a $399 price point, the other is $499. But I can say we've been – ***the HERO6 Black sell-through has been quite good as we've commented before. Comparing to our HERO4 Black, which was the same price point, we're doing***

*much better at that price point than the HERO4 Black did, so I think you've got to kind of take it from that perspective.* [Emphasis added.]

150.    The statements referenced in ¶149 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) demand for the HERO6 Black was weak, largely due to its high price tag; (ii) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; (iii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand; (iv) Defendant McGee's avoidance of the analyst's requested comparison of the HERO6 to the HERO5 in favor of a comparison of the HERO4 to the HERO6 omitted internally known negative effects -- including, but not limited to, price cannibalization -- of simultaneously marketing two similar, high-priced products; (v) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (vi) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

151.    Even though GoPro surpassed expectations on both revenue and earnings per share for Q3 2017, the stock dropped more than 10% in after-hours trading on November 1, 2017 based on what the media variously described as "the company's poor forward-looking guidance"[4] or "downbeat fourth-quarter guidance".[5]

152.    On November 2, 2017, JP Morgan analysts stated that:

*The company posted strong F3Q17 results but the slightly disappointing 4Q guidance – which marks a surge back to 2H profitability - are conservative in our view, setting*

---

[4]   https://techcrunch.com/2017/11/01/gopro-stock-dives-9-after-hours-on-poor-guidance-for-holiday-season/

[5] https://www.nasdaq.com/article/heres-where-things-went-wrong-for-gopro-in-2017-cm906961

*up for another easy beat in 4Q.* GPRO continues to operate on less than full-throttle, operating with lean inventory to achieve predictable growth, buoy profitability and re-build the balance sheet. The 2018 outlook calls for double-digit revenue growth, continued improvement in profitability and "several" new products, which might include entry into a new category. ***GPRO stock might trade down a bit today on the weaker-than-expected 4Q guidance, but this will present a buying opportunity ahead of a de-risked 4Q*** …. [Emphasis added].

153. Likewise, Morgan Stanley dismissed "softer HERO5 demand" as "an incremental concern," in light of "promotional activities for the HERO5 into the holidays." This response was the result of Defendant Woodman's downplaying of the problem during the Q3 2017 Earnings Call.

154. In other words, the analysts' view of GoPro's 4Q guidance as overly conservative was a result of Defendants' misrepresentations, when in reality Defendants knew, or recklessly disregarded, that its 4Q guidance was not conservative but was in fact unrealistic and unachievable given the facts known to Defendants at the time.

155. On November 3, 2017, GoPro filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2017 10-Q"). According to the Q3 2017 10-Q, the Company still expected Q4 2017 sales to be larger than Q2 2017 and Q3 2017 sales, stating in pertinent part as follows:

*Seasonality.* Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

156. Also in the Q3 2017 10-Q, GoPro reiterated that it had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," noting that "[f]ourth quarter revenue comprised 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively" – so always more than 25% of annual revenues and sometimes nearly 50%. GoPro further stated that it "anticipate[d] that this seasonal impact [was] likely to continue."

157. The statements referenced in ¶¶155-156 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed

to disclose that: (i) their holiday season strategy included lower prices that Defendants knew, based on previous experience, would likely have a negative impact on revenue; (ii) Defendants' holiday-season price reductions would reduce the costs of their products to the point of unprofitability; (iii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (iv) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.

158.    In the Q3 2017 10-Q, GoPro stated under Item 1A – Risk Factors that "[t]he risks described in "Risk Factors," in our Annual Report on Form 10-K for the year ended December 31, 2016, and as supplemented below, could materially and adversely affect our business, financial condition and results of operations. We do not believe any of the updates below constitute material changes from the risk factors previously disclosed in our 2016 Annual Report."

159.    In the 2016 Annual Report on Form 10-K filed with the SEC on February 17, 2017, referred to in ¶158 above, and incorporated by reference in the Q3 2017 10-Q, GoPro discussed the following risk factors, in relevant part:

> The success of new product introductions depends on a number of factors including, but not limited to, timely and successful research and development, pricing, market and consumer acceptance, the effective forecasting and management of product demand, purchase commitments and inventory levels, the availability of products in appropriate quantities to meet anticipated demand, the management of manufacturing and supply costs, the management of risks associated with new product production ramp-up issues, and the risk that new products may have quality issues or other defects or bugs in the early stages of introduction. ***In addition, the introduction or announcement of new products or product enhancements may shorten the life cycle of our existing products or reduce demand for our current products, thereby offsetting any benefits of successful product introductions and potentially lead to challenges in managing inventory of existing products. Failure to complete product transitions effectively or in a timely manner could harm our brand and lead to, among other things, lower revenue, excess prior generation product inventory, or a deficit of new product inventory and reduced profitability.*** [Emphasis added.]

160.    The risk factors referenced in ¶¶158-159 above relating to the reduction of demand for GoPro's existing products were false and misleading because at the time the statements were made,

the risk had materialized with respect to the introduction of GoPro's new products. Specifically, Defendants knew, and failed to disclose, that: (i) demand for the HERO6 Black was weak, largely due to its high price tag; (ii) the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales; and (iii) the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand.

161.    GoPro went on to disclose, in its Q3 2017 10-Q, the following additional risk factors, in relevant part:

> We expect to derive the substantial majority of our revenue from sales of cameras, mounts and accessories for the foreseeable future. A decline in the price or unit demand for these products, whether due to macroeconomic conditions, competition or otherwise, or our inability to increase sales of these products, would harm our business and operating results more seriously than it would if we derived significant revenue from a variety of product lines and services. In particular, a decline in the price or unit demand of our top-selling HERO5 and HERO6 Black cameras or our inability to increase sales of these products, could materially harm our business and operating results.

162.    The risk factors referenced in ¶161 above relating to the potential reduction in price or decline in demand for the HERO5 and/or HERO6 cameras were false and misleading because at the time the statements, the risk had materialized with respect to the demand for GoPro's camera offerings, such that Defendants knew that (i) their holiday season strategy included  lower prices, which Defendants knew, based on previous experience, would likely have a negative impact on revenue; (ii) Defendants' holiday-season price reductions would reduce the costs of their products to the point of unprofitability; and (iii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues.

163.    The Q3 2017 10-Q, contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Woodman and McGee, stating that the financial information contained in the Q3 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

164.    The statements referenced in ¶163 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results as discussed in ¶¶155-162 above.   More specifically, the SOX certifications signed by Defendants Woodman and McGee failed to disclose that Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues.

165.    Reacting to the representations made in the Q3 2017 10-Q, Oppenheimer analyst Andrew Uerkwitz wrote that "GoPro has executed well and surprised many along the way (including us, when management gave its double-digit revenue growth/nonGAAP positive net income guidance, our estimates were skeptical […]). And today, based on updated guidance, it will meet or exceed those goals."[6]

**The Truth Begins to be Revealed and the Risk begins to Materialize**

166.    On January 4, 2018, it was reported in the tech press that GoPro would lay off 200 to 300 employees that week, mostly from its drone division.[7]

167.    In response, JP Morgan announced on January 5 that "[w]e are cutting estimates and our Price Target for GPRO, reflecting our view that sales and margins will come in at the low end of 4Q guidance." That is, based on the Company's representations, JP Morgan still expected GoPro to report sales in the $460 million range.

168.    On Sunday, January 7, 2018, GoPro announced a price cut to the HERO6 to $399 from $499. The discount exceeded previous promotions seen during Q4, and prompted Morgan Stanley to pessimistically note that "[w]e had previously seen an avenue for growth with the refresh of the HERO

---

[6] At all relevant times, analysts were following the Company's statements and analyzing forecasting closely. Prior to the issuance of the Q3 2017 10-Q, analysts had been skeptical of what they regarded as GoPro's timidity with respect to Q4 projections.  For example, as noted in ¶152 above, on November 2, 2017, JP Morgan analysts wrote that "the slightly disappointing 4Q guidance – which marks a surge back to 2H profitability- are conservative in our view, setting up for another easy beat in 4Q." Likewise, during the Q3 2017 Earnings Call, Mike Koban of Raymond James questioned whether GoPro was "implying kind of a low double-digit decline year-over-year …." *See* ¶145 above.

[7]    *See*    https://techcrunch.com/2018/01/04/gopro-cuts-200-300-jobs-largely-impacting-its-drone-division/

1    Session, but continued margin pressure on the current lineup overshadows potential pent up demand for

2    a new entry level camera."

3    169.   On January 8, 2018, GoPro issued a press release filed on Form 8-K with the SEC

4    entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results," revealing results for its 4Q17

5    – the quarter that included GoPro's all-important 2017 holiday selling season, where it had forecast

6    sales of $470 million and analysts had been led to believe GoPro would report sales exceeding $472

7    million based on defendants' bullish Class Period statements, an amount that was widely viewed

8    *unimpressive* at the time.   The press release stated in relevant part:

9

10       SAN MATEO, Calif., January 8, 2018 - GoPro, Inc. (NASDAQ: GPRO) today
         reported   certain   preliminary   financial   results   for   the   fourth   quarter   ended
11       December 31, 2017. *GoPro expects revenue to be approximately $340 million for
         the fourth quarter of 2017. Fourth quarter revenue includes a negative impact*
12       *of approximately $80 million for price protection on HERO6 Black, HERO5*
         *Black and HERO5 Session cameras, as well as the Karma drone.*

13                                              ***

14       "As we noted in our November earnings call, at the start of the holiday quarter we
         saw soft demand for our HERO5 Black camera," said GoPro founder and CEO
15       Nicholas Woodman. "Despite significant marketing support, we found consumers
         were reluctant to purchase HERO5 Black at the same price it launched at one year
16       earlier. Our December 10 holiday price reduction provided a sharp increase in sell-
         through."
17
                                                ***
18
         •   *GoPro is reducing its global workforce* from 1,254 employees as of
19           September 30, 2017 to fewer than 1,000 employees worldwide.

20       •   GoPro founder and *CEO Nicholas Woodman will reduce his 2018 cash*
             *compensation to $1.*
21
         •   Although Karma reached the #2 market position in its price band in 2017,
22           the product faces margin challenges in an extremely competitive aerial
             market. Furthermore, a hostile regulatory environment in Europe and the
23           United States will likely reduce the total addressable market in the years
             ahead. *These factors make the aerial market untenable and GoPro will*
24           *exit the market after selling its remaining Karma inventory.* GoPro will
             continue to provide service and support to Karma customers.
25
         A restructuring of GoPro's business will result in an estimated aggregate charge of
26       $23 million to $33 million, including approximately $13 million to $18 million of
         cash expenditures as a result of a reduction in force, substantially all of which are
27       severance and related costs, as well as approximately $10 million to $15 million of
         other charges, consisting primarily of non-cash items. GoPro expects to recognize
28       most of the restructuring charges in the first quarter of 2018. GoPro will provide

                  CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
                            OF THE FEDERAL SECURITIES LAWS

more detail on its 2017 results and 2018 outlook in its fourth quarter earnings report which will take place in early February.
(Emphasis added.)

170.   To summarize, GoPro announced that it expected fourth-quarter revenue to arrive at roughly $340 million -- *$120 to $140 million* below its November guidance for sales in the range $460 million to $480 million.  GoPro also called for adjusted operating margin of between 25% and 27%, a far cry from guidance for 41% to 42%.  GoPro's implied non-GAAP operating income reflected a $32 million loss against guidance for $65 million profit.  In addition, the Company announced that more than 250 employees would be let go (20% of the workforce), the Karma would be discontinued, and CEO Nick Woodman will be taking a salary of $1 going forward.  This was a radical shift from just a few months earlier, when the worst news the Company had for investors was "soft demand" for the HERO5 Black – a problem that GoPro told investors was solvable through marketing efforts.

171.   GoPro's Q4 preliminary results included the negative impact of roughly $80 million in price protection related to the recent price reductions of its HERO6 Black, HERO5 Black, and HERO5 Session cameras, as well as its Karma drone.

172.   On this news, GoPro stock price declined, falling from a close of $7.52 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share on unusually high trading volume of more than 59 million shares traded. The drop was so severe, almost 13%, that short sellers betting against GoPro raked in roughly $45 million in mark-to-market profits.

173.   Upon the disclosure of preliminary 4Q17 sales results, the market now learned that sales were much worse than previous guidance.  The market understood that the previous impression given by the Company that demand was high enough such that November 2017 guidance could be considered an "easy beat" was not true.

174.   Analysts were shocked.  Longbow analyst Joe Wittine downgraded to a Neutral rating on GoPro stock without listing a price target.  Wedbush Securities analyst Alicia Reese wrote that "[t]he increasing power and presence of smartphones have negatively impacted sales of GoPro's

products, with its pace of innovation unable to offset creeping market saturation," and downgraded GoPro to $6 from $10.50.

175.   Market observers questioned Defendant Woodman's leadership, suggesting that he "relinquish his daily management of GoPro" or "take a nonexecutive chair role by bringing in a real outsider as CEO to allow GoPro to get back on track."[8]  *Vanity Fair* described him as "an avatar for the overinflated, hype cycle-driven tech boom-turned-bust."[9]

176.   On January 9, 2018, Defendant Woodman gave an interview to *TechCrunch* in which he blamed the Company's abysmal Q4 2017 results and the demise of the drone program on factors that were well-known within GoPro at the start of the Class Period:

> ***While the founder asserted that he believes things would have fared differently for the company's Karma drone program had it not dealt with its initial "horrible launch,"*** he said that the decision to shut it down was ***ultimately due to a "domino effect" that resulted from poor sales of the company's last-gen Hero5 action camera.***
>
> ***These poor sales led the company to drop the Hero5 Black action camera's price from $399 to $299 and eventually led to further price restructuring, including a $100 price cut yesterday to the brand new Hero6 Black.***
>
> ***"If Hero5 Black had sold to expectations at its original $399 pricing, we would not have had to change prices across all of our cameras, and we would not have had to do a restructuring*** and we would have been able to continue investing in programs like our next generation Karma," Woodman said. "But reality is reality."[10]  (Emphasis added).

177.   Leaving aside the fact that the Karma was relaunched in ***February 2017*** into a market that contained visibly superior competitors, the pricing problems with the HERO5 Black were downplayed by Defendants during the Q3 2017 Earnings Call, despite being well-known internally at GoPro.  Defendant Woodman, at all relevant times, had access to sales data and held regular internal meetings with respect to sales.  The price of the HERO5 Black was marked down in December based

---

[8]   https://247wallst.com/consumer-electronics/2018/01/08/why-its-time-for-nick-woodman-to-bring-in-an-outsider-ceo-for-gopro/

[9]  https://www.vanityfair.com/news/2018/01/go-pro-layoffs-self-immolation-warning-to-big-tech

[10] https://techcrunch.com/2018/01/09/gopro-ceo-explains-shutdown-of-drone-program/

on previous reported sales.  Yet at no time during the Class Period was the escalating "domino effect" cited by Defendant Woodman disclosed to investors.

178.   Further, by offering false and inflated guidance in November 2017, GoPro concealed the true (lower) level of demand for its products, and in turn the risk that November 2017 guidance was neither conservative nor an easy beat, but rather unachievable.  Thus, as the Company's poor fourth-quarter financial results, which badly missed consensus expectations, as well as its 20% workforce reduction and shutdown of its drone business, were foreseeable consequences of the Company's true, yet concealed, level of product demand, and as such they reflect the materialization of this concealed risk.

179.   The "domino effect" invoked by Defendant Woodman also serves as a direct admission that the factors leading to GoPro's abandonment of its drone program were rooted in internally-known conduct stretching back to 2015-2016, when a similar round of price cuts caused GoPro to take a substantial write down and the HERO5 was absent from the market during the 2016 holiday season.

## Confirmatory Disclosures

180.   On January 9, 2018, Defendant Woodman spoke at the JP Morgan CES Tech Forum, where Paul Coster asked, "Nick, what just happened?" Defendant Woodman responded that –

*As it turns out, a number of our customers either already owned HERO5 Black or they had passed on HERO5 Black the previous year during that upgrade cycle. And they certainly didn't feel good about buying HERO5 Black now in 2017 a year later for the same price that they could have bought it for in 2016.*  [Emphasis added.]

181.   Defendant Woodman also stated, in pertinent part:

*And we've learned a lot over – we've gathered a lot of data over our various Q4 misses that when you start to see some repeat patterns, the nature of your mistakes, the cause and effect, and the impact of those mistakes becomes clear. And so, what this is allowing us to do is to predict better what our sell-through rates are going to be at various price points.* We were able to predict the lifts that we're now seeing in our business. *We understand the mistakes we've made in the past, so that it can help us avoid them, ultimately helping us be more predictable in the future*.  [Emphasis added.]

182.   Defendant Woodman further stated, in pertinent part:

There is a certain percentage of our customers who are willing to pay $500 for the very best GoPro, provided that GoPro is worth it, and it was. ***But with the other price moves, there was too big of a gap between $299 and $499, and we were seeing too much cannibalization of HERO6 Black.*** So, it was clear that it was better for the business to price-reduce HERO6 Black to $399. And at gopro.com, we've seen a 10x increase in sell-through of HERO6 Black and more than a 10x uplift in sell-through at Amazon. So, still very early days going on in a couple of days, ***but the data is playing out and we're seeing the sales lifts that we were hoping to see when we made the price moves***. [Emphasis added.]

183.   With respect to the Karma, Defendant Woodman stated that:

The problem is that, as we look towards the second generation of Karma that we were developing, that frankly was looking like a phenomenal product, ***we recognize that to be competitive, the margins were going to continue to be very thin. And when we consider the total number of units of Karma and then Karma 2 that we were going to sell relative to the number of GoPros that we sell, it just became clear that because we're more of a data-driven business now, we have to acknowledge the fact that the data shows that our customers want a more convenient mobile-connected GoPro far more than they want a drone***.

Our customers want to buy GoPros from us. Our customers don't want a media and entertainment business from us. They don't want professional solutions from us. ***They don't really want drones from us.*** They want better GoPros at attractive prices. [Emphasis added.]

184.   The statements referenced in ¶¶180-183 above failed to acknowledge GoPro's recent 2015 experience with lower-priced products and product cannibalization, that by Defendant Woodman's own logic, would have provided the Company with the ability to anticipate the consequences of repeating the same errors.  Indeed, Defendant Woodman claimed that the Company was able to draw data-based conclusions regarding price cuts to the HERO6 Black ***within 2 days*** of those cuts taking effect.  This is consistent with Confidential Witness statements that Defendants had ready access to internal marketing and sales data during the Class Period.  *See* ¶¶69, 80, 83-87, 97-98, 108 above.  In addition, it was common knowledge within GoPro during the Class Period that incremental upgrades to existing cameras would not generate sufficient consumer demand or sales. *Id.*, ¶¶61-62, 74-75.

185.   The statements referenced in ¶¶180-183 also comprise a direct admission that in order for GoPro to achieve sales targets, it must lower prices to the point of unprofitability.  As one

commentator recently observed, "GoPro has no pricing power. At this point, GoPro's success or failure comes down to being a low-cost producer of action cameras. That's not a great place to be."[11] In addition to not being a great place to be, GoPro's niche as a budget enterprise (and the resultant revenue shortfalls that necessarily accompany that role) was known to Defendants during the Class Period, but was not disclosed to investors at any point during the Class Period.

186.    The statements referenced in ¶¶180-183 also serve as an admission that the Company was able to interpret a lack of demand for the Karma from its internal sales data.   Moreover, Confidential Witness statements confirm that lack of market recognition  and lack of demand for the Karma was readily apparent by the spring and summer of 2017.

187.    On February 1, 2018, GoPro shares fell 4.3% in after-hours trading after the Company released its full fourth-quarter results.   GoPro's actual reported earnings missed the figures it had estimated just three weeks earlier, figures which themselves revealed a *second* earnings miss:

- **Revenue: $334.8 million versus "approximately" $340 million.**

- **Non-GAAP gross margin: 24.8% versus 25-27%.**

- **Non-GAAP operating expenses: $120.3 million versus $112-$118 million.**

188.    The midpoint of the estimated ranges in the preliminary numbers suggested an operating loss of $26.6 million.  The full numbers revealed that GoPro lost approximately $10 million more than that — $37.4 million, to be precise.  Previously, on January 18, 2018, Adam Rogers of *Market Realist* had reported that "[a]nalysts expect the company to post revenue of $354.7 million for the quarter. Wall Street has a low revenue estimate of $339.7 million and a high estimate of $472 million for GoPro for the quarter …." GoPro's final numbers came in well below Wall Street's low estimate, and revenue was nowhere close to even the tamped down expectations of mid-January 2018.

189.    The February 1, 2018 disclosure confirmed that Q4 2018 was actually worse for GoPro than was originally believed, and highlights the extent to which Class members were harmed

---

[11]    https://www.fool.com/investing/2018/05/08/gopros-earnings-beat-wasnt-as-impressive-as-you-th.aspx

by Defendants' illusory guidance and distortions regarding the Company's true financial condition.

190.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

191.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GoPro common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the materialization of the undisclosed risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

192.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GoPro common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GoPro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

193.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

194.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

195.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of GoPro;

- whether Defendants caused GoPro to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of GoPro securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

197.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period, as discussed in ¶¶123-164 above;

- these omissions and misrepresentations were material;

- GoPro common shares are traded in efficient markets;

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiffs and members of the Class purchased and/or sold GoPro common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

198.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

199.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

200.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.    This Count is asserted against GoPro and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

202.    During the Class Period, GoPro and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

203.   GoPro and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (*see* ¶¶123-164 above); or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GoPro common shares during the Class Period.

204.   GoPro and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GoPro were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.   In particular, as alleged herein:

- Defendants Woodman and McGee attended regular meetings at which contemporaneous sales and marketing issues were discussed, and Defendants had access to internal sales, marketing, and product demand data confirming weak demand for GoPro's products;

- GoPro has a demonstrated history of providing flawed guidance to investors and analysts. The guidance provided for Q4 2017 marked the fourth time in the previous three years that guidance was materially inaccurate;

- GoPro has demonstrated an inability to properly forecast revenue and/or sales. Regardless of the particular reason behind the Company's failures, the fact remains that GoPro did not have the internal controls in place to properly forecast revenue and/or sales, and the lack of internal controls was communicated directly to Defendants Woodman and McGee; and

- Defendants Woodman and McGee engaged in suspicious Class Period stock sales.

205.    Defendants, by virtue of their receipt of information reflecting the true facts of GoPro, their control over, and/or receipt and/or modification of GoPro's allegedly materially misleading statements, and/or their associations with the Company, were privy to confidential proprietary information concerning GoPro, and participated in the fraudulent scheme alleged herein.

206.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other GoPro personnel to members of the investing public, including Plaintiffs and the Class.

207.    As a result of the foregoing, the market price of GoPro common shares was artificially inflated during the Class Period.  In ignorance of the falsity of GoPro's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of GoPro common shares during the Class Period in purchasing GoPro common shares at prices that were artificially inflated as a result of GoPro's and the Individual Defendants' false and misleading statements.

208.    Had Plaintiffs and the other members of the Class been aware that the market price of GoPro common shares had been artificially and falsely inflated by GoPro's and the Individual Defendants' misleading statements and by the material adverse information which GoPro's and the Individual Defendants did not disclose, they would not have purchased GoPro's common shares at the artificially inflated prices that they did, or at all.

209.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class suffered damages upon the disclosures/materialization of the risks identified herein, in amounts to be established at trial.

210.    By reason of the foregoing, GoPro and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and

the other members of the Class for substantial damages which they suffered in connection with their purchase of GoPro common shares during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants
### (Control Person Liability)

211.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.   During the Class Period, the Individual Defendants participated in the operation and management of GoPro, and conducted and participated, directly and indirectly, in the conduct of GoPro's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the true state of the Company's financial condition.

213.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GoPro's financial condition and results of operations, and to correct promptly any public statements issued by GoPro which had become materially false or misleading.

214.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GoPro disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GoPro to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GoPro within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GoPro common shares.

215.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GoPro.

1
2

## COUNT III
### Violations of Section 20A of the Exchange Act Against Defendants Woodman and McGee
### (Insider Trading)

3

216.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

4

paragraphs as if fully set forth herein.

5

217.    This Claim is brought against Defendants Woodman and McGee under Section 20A of

6

the Exchange Act, 15 U.S.C. § 78t-1.

7

218.    On November 3, 2017, Defendant Woodman sold 515,000 GoPro shares at $9.30 per

8

share, for a total of $4,789,963.50

9

219.    On November 6, 2017, Defendant Woodman sold 165,343 GoPro shares at $9.0193

10

per share, for a total of $1,491,278.11.

11

220.    On November 7, 2017, Defendant Woodman sold 26,637 GoPro shares at $9.00 per

12

share, for a total of $239,733.00.

13

221.    On November 10, 2017, Plaintiff Birlenbach purchased 4,100 GoPro shares at an

14

average price of $8.53 per share.

15

222.    On November 13, 2017, Plaintiff Birlenbach purchased 54,800 GoPro shares at an

16

average price of $8.58 per share.

17

223.    On November 16, 2017, Defendant McGee sold 7,541 GoPro shares at $8.27 per

18

share, for a total of $62,364.07.   The same day, Plaintiff Birlenbach purchased 100 GoPro shares at

19

$8.28 per share.

20

224.    On November 17, 2017, Plaintiff Birlenbach purchased 2,900 GoPro shares at an

21

average price of $8.44 per share.

22

225.    Because of their senior positions at GoPro, Defendants Woodman and McGee had

23

access to the Company's sales data and financial reports and were aware of and/or recklessly

24

disregarded the Company's true financial condition in GoPro's public statements during the Class

25

Period.

26

226.    Defendants Woodman and McGee, through their senior positions at GoPro, had access

27

to GoPro's material, nonpublic and highly confidential information concerning the Company's true

28

financial condition and the knowledge that GoPro's financial condition was materially misstated during the Class Period.  By virtue of their receipt thereof, Defendants Woodman and McGee were duty bound not to benefit therefrom, a duty which they violated by selling their shares at inflated prices.

227.    Defendants Woodman and McGee thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

228.    The measure of damages for trading while in possession of material nonpublic information under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, is the disgorgement of profits gained and losses avoided by such trading.

229.    Lead Plaintiff Birlenbach and Class Members who likewise purchased GoPro shares contemporaneously with the Defendants Woodman and McGee's sales are entitled to disgorgement of the amounts by which Defendants Woodman and McGee profited from such trades.

230.    By virtue of the foregoing, Defendants Woodman and McGee are liable for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

231.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

1    Dated: June 18, 2018                              Respectfully submitted,

2

3                                                      **POMERANTZ LLP**

4                                                      By: /s/ Leigh Smollar
                                                       Patrick V. Dahlstrom
5                                                      Leigh Handelman Smollar
                                                       Louis C. Ludwig
6                                                      10 South LaSalle Street
                                                       Chicago, IL 60603
7                                                      Telephone: (312) 377-1181
8                                                      Email: pdahlstrom@pomlaw.com
                                                              lsmollar@pomlaw.com
9                                                             lcludwig@pomlaw.com

10
                                                       **POMERANTZ LLP**
11                                                     Jennifer Pafiti (SBN 282790)
                                                       468 North Camden Drive
12                                                     Beverly Hills, CA 90210
                                                       Telephone:    (818) 532-6499
13                                                     Email: jpafiti@pomlaw.com

14
                                                       **POMERANTZ LLP**
15                                                     Jeremy A. Lieberman
                                                       J. Alexander Hood
16                                                     600 Third Avenue, 20th Floor
                                                       New York, NY 10016
17                                                     Telephone:  (212) 661-1100
                                                       Facsimile:  (212) 661-8665
18                                                     Email: jalieberman@pomlaw.com
19                                                            ahood@pomlaw.com

20
                                                       **THE ROSEN LAW FIRM, P.A.**
21                                                     Laurence M. Rosen, Esq. (SBN 219683)
                                                       355 S. Grand Avenue, Suite 2450
22                                                     Los Angeles, CA 90071
                                                       Telephone: (213) 785-2610
23                                                     Facsimile: (213) 226-4684
                                                       Email: lrosen@rosenlegal.com
24

25                                                     Co-Lead Counsel for Plaintiffs

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on June 18, 2018 a copy of the foregoing was filed electronically via the

3

Court's CM/ECF system, and served by mail on anyone unable to accept electronic filing as indicated

4

on the Notice of Electronic Filing.  Notice of this filing will be sent by e-mail to all parties by

5

operation of the Court's electronic filing system. I hereby certify that I caused to be mailed the

6

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

7

indicated on the Court's Manual Notice List.  Parties may access this filing through the Court's

8

CM/ECF System.

9

I certify under penalty of perjury under the laws of the United States of America that the

10

foregoing is true and correct.

11

Executed on June 18, 2018.

12

13

14

15

_/s/ Leigh Smollar_
Leigh Smollar

16

17

18

19

20

21

22

23

24

25

26

27

28