UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONG MIN PARK, et al., | Case No. 18-cv-00193-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| GOPRO, INC., et al., | Docket No. 76 |
| Defendants. | |

## I.   FACTUAL & PROCEDURAL BACKGROUND

Co-lead Plaintiffs in this matter are Julie Wiegand and Michael Birlenbach ("Plaintiffs"). Amended Complaint ("Amended Complaint") at 1.  Their allegations are based upon personal knowledge with respect to Plaintiffs' own acts and based on information and belief as to all other matters.  *Id.*  Defendant GoPro is a company incorporated in Delaware with its principal office in San Mateo, California.  *Id.* ¶ 21.  Defendant Woodman has at all relevant times been the Chairman and Chief Executive Officer of GoPro.  *Id.* ¶ 22.  Defendant Prober has at all relevant times served as GoPro's Chief Operating Officer.  *Id.* ¶ 23.  Defendant McGee has at all relevant times served as GoPro's Chief Financial Officer.  *Id.* ¶ 24.

The class includes all persons other than Defendants who purchased or acquired common shares of GoPro stock between November 2, 2017 and January 5, 2018, both dates inclusive (the "Class Period").  *Id.* ¶ 1.  Plaintiffs' claims arise from violations of 10(b) and 20(a) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.

Defendant "GoPro, Inc. develops and manufactures wearable and gear-mountable cameras along with related accessories."  *Id.* ¶ 2.  Its most prominent product offerings include: the HERO5

and HERO6 which are cloud connected cameras; as well as, the Karma which is a drone, and Karma Grip which is a "handheld and body-mountable camera stabilizer to capture zero-shake and smooth video." *Id.* GoPro sells its products mostly through retailers, distributors, and its website. *Id.*

A. <u>False Statements</u>

Plaintiffs take issue with Defendants continued assurance of investors that GoPro was "in all respects, on track to achieve a profitable fourth quarter." *Id.* ¶ 3. They allege that "Defendants issued materially false and misleading statements" and omitted material facts "regarding the market for GoPro's products, as well as sales thereof." *Id.* ¶ 5.

Among the poor strategies Plaintiffs reference is GoPro's decision to offer the HERO5 and HERO6 at the same price point which "cannibalized sales of the HERO6." *Id.* ¶ 4. Similarly, Plaintiffs contend that Defendants should have alerted the public to the "precariousness of GoPro's drone operations" particularly because they "promised the SEC in May 2017 that GoPro would apprise the market of 'known trends and uncertainties relating to the Karma." *Id.* ¶ 10. They allege "[t]he continued viability of the Karma drone, which also suffered from weak demand throughout 2017, was dependent on GoPro's traditional source of revenue – camera sales – to fund research and development of the next drone model. This, combined with the ongoing failure of GoPro's Karma drone to produce revenue, sealed the fate of GoPro's drone division." *Id.*

On September 30, 2017, GoPro's third quarter closed. Bafus Decl., Exhibit 2. On November 1, 2017, GoPro released the results for the third quarter ("Q3 2017"), and on the same day GoPro held the conference call where the quotations at issue arose. *Id.* Plaintiffs allege that the fourth quarter guidance issued in November 2017 was unachievable and Defendants knew this but nevertheless did not alert the market. *Id.* ¶ 8. Plaintiffs contend that not only was the guidance misleading, but the conference call on the guidance on November 1, 2017 "touted the Company's products, as well as its prospects of the fourth quarter of 2017 ('Q4 2017'), despite having direct knowledge of GoPro's true financial condition." *Id.* ¶ 8. The Amended Complaint states that "[i]n an attempt to meet its unrealistic Q4 2017 guidance, GoPro resorted to price cuts to move inventory, culminating in the same predictable, deleterious effects on revenue the

Company experienced when it tried the same strategy in 2015." *Id.* ¶ 9.

Plaintiffs allege that many statements about Q4 2017 prospects made by Defendants during the Q3 Earnings Call and in the form 8-K press release were false or misleading. They allege that there were false statements made about: the HERO5, the HERO6, the Session, the Karma, and the Q4 2017 guidance.

Plaintiffs allege that "several of GoPro's senior executives cashed in with unusually timed stock sales." *Id.* ¶ 6. Between Defendants Woodman and McGee, they "sold more than 700,000 shares of personally held stock for gross proceeds of more than $6.5 million." *Id.* ¶ 6. Defendant Woodman sold 10% of his shares in GoPro shortly after making the allegedly false statements. *Id.* ¶ 119. Plaintiffs point to a letter from Defendant Woodman explaining that he sold his shares pursuant to a 10b5-1 stock sales plan, which was set up "a while ago to automatically sell shares for [him] when certain criteria are met." *Id.* ¶ 121. Similarly, "[o]n November 16, 2017, Defendant McGee sold 7,541 GoPro shares at $8.27 per share, for a total of $62,364.07, which represented nearly 10% of his holdings at the time." *Id.* ¶ 120.

B.  Disclosure

On January 8, 2018, "GoPro issued a press release filed on Form 8-K with the SEC entitled 'GoPro Announces Preliminary Fourth Quarter 2017 Results,' revealing that its fourth quarter 2017 sales were $340 million, significantly below analysis' projections of $470 million." *Id.* ¶ 11. GoPro alleged that the poor sales were due to "slashing of prices for its HERO6 Black, HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter which the Company had been forced to do to move inventory, and which had a negative $80 million impact on revenues." *Id.* "GoPro had cut the price for its HERO5 Black camera in December 2017, and announced it was now reducing the price of its newly launched HERO6 model to $399 from $499." *Id.* ¶ 11. GoPro also announced it would be laying off employees, "[t]he workforce reduction would cost GoPro $33 million, mainly in severance costs." *Id.*

After disclosing this news, the stock price declined 12%, "falling from a close of $7.53 per share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018, before closing at $6.56 per share on an unusually high trading volume of more than 59 million

shares traded." *Id.* ¶ 12.  Plaintiffs point to Defendant Woodman's statement that GoPro's missed earnings were a "domino effect" that began with slow sales of the HERO5 because of the HERO6's cannibalization.  *Id.* ¶ 14.

C.      Confidential Witnesses

        In support of their allegations, Plaintiffs rely on five Confidential Witnesses ("CWs").

        1.      Confidential Witness 1

        CW1 "was employed in the marketing department at GoPro from February 2015 to July 2017." *Id.* ¶ 59.  "As a member of the marketing team, CW1 reported to Michael Kenny ('Kenny'), who was Director of Marketing; Bryan Johnston ('Johnston'), SVP of Marketing; and Michael Zoglio, Head of Analytics at varying times through CW1's employment.  CW1's job duties involved market research, monitoring consumer opinions on GoPro products and reactions to marketing campaigns." *Id.*  It is worth noting that CW1's employment did not extend into the class period (November 1, 2017 to January 5, 2018), and CW1 was not employed at GoPro when Defendants made the allegedly false or misleading statements.  In fact, CW1 left the company two months before the HERO6 Black even launched.  *See* Bafus Decl., Exhibit 3.

        CW1 referenced a general trend of declining sales for her last 18 months at the company. *Id.* ¶ 60.  "CW1 stated that the HERO6 (and the HERO5 before that) simply did not offer distinct enough features to separate them from earlier models of the camera and spark sales." *Id.* ¶ 61. "CW1 stated that CW1 and a number of other employees expressed internally at the Company that those products were not going to grow GoPro." *Id.* ¶ 62.

        CW1 explained "that contrary to the Company's statement at the end of Q3 2017 (on November 1, 2017) that the demand for GoPro products was strong, CW1 did not consider the demand strong, especially in comparison to the strength of demand the Company once enjoyed based on CW1's experience during the two-and-a-half years of observing sales trends at GoPro and CW1's understanding as a marketing professional of the way consumer appetites wax and wane for particular products.  'I felt consumer appetites were on the wane for GoPro,' CW1 said. 'People weren't paying close attention to us.  We weren't the hot product anymore.'" *Id.* ¶ 63. GoPro's Q3 2017 was July through September 30, 2017.  Bafus Decl., Exhibit 2.  GoPro released

the results for Q3 2017 on November 1, 2017, which is when they claimed that demand was strong. *Id.* CW1 was employed during a portion of Q3 2017 as she remained at the Company until July 2017, but she was absent for most of the quarter and was not employed when Defendants made the statement that demand was strong.

"According to CW1, sales were declining during Q3 2017, and had been for well over a year-and-a-half. In particular, by time CW1 left GoPro in July 2017, the Company was aware that the Karma was no longer competitive with DJI's drones, and that the Karma was not selling. CW1 said it was internally-known at GoPro that the Company had missed its window of opportunity to get a foothold in the drone market when the 2016 launch of the Karma was mired with recalls and subsequent engineering efforts to fix the problem." *Id.* ¶ 64. "CW1 stated that Defendant Woodman had a tendency during investor calls to speak highly of the Company's prospects despite sales trends showing otherwise." *Id.* ¶ 65.

CW1 claimed that GoPro's marketing department met weekly to discuss efforts and future plans with high-level executives and that CW1 attended most of those meetings. *Id.* ¶ 66. Defendant Woodman also attended most of those meetings and Defendant McGee attended some of those meetings. *Id.* ¶ 67. In the meetings, CW1 claims that the group would discuss marketing campaigns and consumer reaction to messaging. *Id.* ¶ 69. CW1 provides sparse details about what was discussed during these meetings. CW1 states that "GoPro's marketing department met to discuss ongoing efforts and future plans with high-level executives." *Id.* ¶ 67. The only detail CW1 provides regarding these meetings is that "GoPro's marketing staff would report to Defendant Woodman about existing marketing efforts, proposed marketing campaigns and how consumers responded to different types of messaging." *Id.* ¶ 68. CW1 does not explain what specific information was conveyed to Defendants regarding marketing or consumer responses. Finally, CW1 claims that GoPro had an internal system to track updated sales numbers. *Id.* ¶ 69.

### 2. Confidential Witness 2

"CW2 was Director of Marketing for Latin America at GoPro from July 2015 to May 2017." *Id.* ¶ 70. As with CW1, CW2 was not employed at GoPro during the class period or when Defendants made the allegedly false statements. CW2 initially reported to Johnson, but later

5

reported to Kenny. *Id.* ¶ 72. CW2 indicated that employees knew that the HERO6 was not enough of a technological upgrade from previous products and consumers would not be motivated to purchase the more expensive product. *Id.* ¶¶ 73-75. CW2 alleges that because of the inability to motivate consumers, employees realized the HERO6 would not meet sales projections. *Id.* ¶ 75. CW2 does not describe his or her basis of knowledge for this fact as CW2 left before Defendants announced the Q4 2017 projections and before the HERO6 launched.

CW2 described the Karma as lacking name recognition and suffering from bad publicity. *Id.* ¶ 76-77. CW2 explained that GoPro's statements that there was strong demand for the Karma was illogical because the product lacked name recognition, and the recognition it had was negatively associated with a recall. *Id.* ¶ 78. The FAC describes the Karma recall as taking place in early 2017 (*Id.*), but also states that the recall was in November 2016 (*Id.* ¶¶ 13, 53). CW2 also indicated that demand for GoPro products in 2017 was weak, and the statements regarding the strength of demand for GoPro products in late 2017, after CW2 left the company, was false. *Id.* ¶ 79. CW2 implies that Defendants Woodman and McGee must have known that their statements were false because they attended meetings where sales and marketing information was provided to them. *Id.* ¶ 80.

3.    Confidential Witness 3

CW3 was a Channel Marketing Events Specialist from April 2015 to January 2018. "CW3 explained that GoPro kept close tabs on sales and consumer demand for its products through internal computer database systems that tracked all sales. These reports were broken down into 'very detailed' categories." *Id.* ¶ 83. CW3 also claimed that "GoPro received reports from large-scale retailers who would visit the Company to disclose what was going on in market." *Id.* ¶ 84. CW3 elaborated on the disappointing Black Friday sales and poor pricing decisions. *Id.* ¶ 89–99. CW3 also "stated that far-lower than expected sales trends were known at the Company." *Id.* ¶ 97. CW3 fails to provide clear details about when and to what extent there were lower than expected sales trends. Plaintiffs do not allege any details as to the time period to which CW3 refers. Nor does CW3 state when employees noticed lower sales trends.

4.     Confidential Witness 4

CW4 was an Inventory Analyst from June 2015 to June 2016, and was employed as Operations Forecast Coordinator from October 2016 to December 29, 2017. *Id.* ¶ 100. "During CW4's second term at GoPro in 2016-2017, CW4 reported to GoPro's Director of Operations. CW4's manager reported to the Senior Director of Operations, who reported to the VP of Operations, who reported to Defendant Woodman. *Id.* ¶ 100. "CW4's job involved coordinating the distribution of GoPro product accessories to various retailers and distribution warehouses." *Id.* ¶ 101. CW4 describes flaws in an inventory distribution software system. *Id.* ¶ 101-104. CW4 claims that when CW4 arrived at GoPro "all purchase orders, logistics, sales revenue data, and other information was processed through NetSuite." *Id.* ¶ 102. GoPro was supposed to integrate NetSuite with Kinaxis in the summer of 2016. *Id.* ¶ 103. GoPro "then planned for the Kinaxis system to be in use by October 2016, but the process was delayed a year." *Id.* CW4 describes that "Kinaxis was incompatible with NetSuite, and that GoPro was still working out some of the incompatibilities even after Kinaxis was installed in or around October 2017." *Id.* ¶ 104. CW4 does not describe how this affected GoPro's ability to properly forecast or how it shows either the falsity or scienter of any of Defendants' statements.

5.     Confidential Witness 5

"CW5 was a Senior Data Analytics Engineer at GoPro from August 2016 to June 2018. CW5 reported to Chester Chen, Senior Manager of Data Science Engineering." *Id.* ¶ 105. CW5's data was used to forecast sales. *Id.* ¶ 109. CW5 described the forecasting tools used by GoPro as "crude and simplistic." *Id.* ¶ 109. CW5 claimed that "GoPro was using Excel spreadsheets and sometimes incomplete data to forecast sales." *Id.* ¶ 110. CW5 indicated that Defendants Woodman and McGee knew that the forecasting systems were poor. *Id.* ¶ 113. CW5 also noted that Amazon and Best Buy were late to report sales numbers (although CW5 does not specifically state whether this was a continued problem during the class period). *Id.* ¶ 116. CW5 states that GoPro often did not even know what current demand was for a product being sold by Amazon or Best Buy. *Id.* ¶ 118.

## II.    DISCUSSION

A.    Request for Judicial Notice

Defendants filed a request for judicial notice in support of their motion to dismiss.

Defendants request that the Court take judicial notice of:

- Exhibit 1, Excerpts from GoPro's filing on Form 10-K for the fiscal year ended December 31, 2016, filed with the Securities and Exchange Commission ("SEC") on or about February 17, 2017;

- Exhibit 2, GoPro's press release entitled, "GoPro Announces Third Quarter 2017 Results," filed with the SEC as an exhibit to Form 8-K on or about November 1, 2017

- Exhibit 3, GoPro's September 28, 2017 press release entitled, "With HERO6, GoPro Sets New Bar for Image Quality, Stabilization and Simplicity,";

- Exhibit 4, GoPro's September 29, 2014 press release entitled "GoPro Introduces HERO4 – The Most Powerful GoPro Lineup, Ever,";

- Exhibit 5, GoPro's Q3 2017 earnings conference call transcript, dated November 1, 2017;

- Exhibit 6, GoPro's press release entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results," which was filed with the SEC as an exhibit to Form 8-K on or about January 8, 2018;

- Exhibit 7, The transcript of an appearance by defendants Nicholas Woodman and Brian McGee at the January 9, 2018 JP Morgan CES Tech Forum;

- Exhibit 8, GoPro's press release entitled, "GoPro Announces Fourth Quarter and Full Year 2016 Results," filed with the SEC as an exhibit to Form 8-K on or about February 2, 2017;

- Exhibit 9, GoPro's press release entitled, "GoPro Announces First Quarter 2017 Results," filed with the SEC as an exhibit to Form 8-K on or about April 27, 2017;

- Exhibit 10, GoPro's press release entitled, "GoPro Announces Second Quarter 2017 Results," filed with the SEC as an exhibit to Form 8-K on or about August 3,

2017;

- Exhibit 11, Excerpts from GoPro's filing on Form 10-Q for the fiscal quarter ended September 30, 2017, filed with the SEC on or about November 3, 2017;

- Exhibit 12, Excerpts from GoPro's Q2 2014 earnings conference call transcript, dated July 31;

- Exhibit 13, Excerpts from GoPro's Q3 2014 earnings conference call transcript;

- Exhibit 14, Excerpts from GoPro's Q4 2014 earnings conference call transcript, dated February 5, 2015;

- Exhibit 15, Excerpts from GoPro's Q1 2015 earnings conference call transcript, dated April 28, 2015;

- Exhibit 16, GoPro's press release entitled "GoPro Announces Fourth Quarter and Full Year 2015 Results," filed with the SEC as an exhibit to Form 8-K on or about February 3, 2016;

- Exhibit 17, Excerpts from GoPro's filing on Form 10-K for the fiscal year ended December 31, 2015, filed with the SEC on or about February 29, 2016;

- Exhibit 18, A screenshot of https://gopro.com/help/tile/cameras (last visited August 14, 2018);

- Exhibit 19, Nicholas Woodman's Form 4 filed with the SEC on or about November 7, 2017;

- Exhibit 20, Brian McGee's Form 4s filed with the SEC on or about November 15, 2016, February 22, 2017, and November 20, 2017;

- Exhibit 21, GoPro's filing on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on November 8, 2017, which attaches as an exhibit the "company-wide message dated November 7, 2017 from Nicholas Woodman, Chief Executive Officer of GoPro, Inc. to employees of the Company" (the "Company-Wide Message").

A party incorporation by reference documents into the complaint "treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

988, 1002 (9th Cir. 2018).  The Court may incorporate a document by reference where the plaintiff has referred "extensively to the document or the document forms the basis of the plaintiff's claim."  *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  The doctrine permits the Court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)) (alteration in original).  However, the incorporation by reference "doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Khoja*, 899 F.3d at 1002.

The Court incorporates by reference Exhibits 1, 2, 5, 6, 7, and 11 as these documents are relied on as the basis for the Amended Complaint.  Exhibit 1 is GoPro's filing on Form 10-K for the fiscal year ending on December 31, 2016.  This document includes the risk factors referenced in Q3 Earnings Call (which is where many of the contested statements arose from).  These risk factors are quoted several times in the Amended Complaint.  Plaintiffs rely on this document throughout the Amended Complaint to show Defendants provided inadequate disclosures for the PSLRA's safe harbor provision.  Thus, Exhibit 1 is incorporated by reference.

Exhibit 2 is a press release which included the Q3 2017 results.  Several of the allegedly false statements arise from this press release.  As statements from this document form the basis of Plaintiffs' allegations, this statement is incorporated by reference.

Exhibit 5 is the transcript of the Q3 Earnings Call which includes many of the allegedly misleading statements.  The conference call is quoted throughout the Amended Complaint, and thereby forms the basis of the AC.  Thus, the Court incorporates this document by reference.

Exhibit 6 is a press release entitled "GoPro Announces Preliminary Fourth Quarter 2017 Results."  It is this document that Plaintiffs contend revealed the truth after the misleading statements.  This press released is quoted in the Amended Complaint and is relied on by Plaintiffs to form their allegations.  For this reason, it is incorporated by reference.

Exhibit 7 is a copy of a transcript from the January 9, 2018 JP Morgan CES Tech Forum in

which Plaintiffs' allege Defendants Woodman and McGee provided confirmatory disclosures that they knew they would not meet Q4 projections. Plaintiffs rely on this document to show the truth being revealed and it therefore form the basis for their Amended Complaint. Thus, the Court incorporates this document by reference.

Exhibit 11 is the Q3 2017 10-Q and includes the risk factors that Plaintiff allege are false and misleading. A large passage of it is quoted in the Amended Complaint and it forms the basis for one of the many allegations made against Defendants. AC ¶ 159. As this document is used as the basis for Plaintiffs' allegations, it forms the basis of the Amended Complaint and is thereby incorporated by reference.

As Exhibits 1, 2, 5, 6, 7, and 11 provided the basis for the allegations in the Amended Complain; however, because the truth of these statements is contested, the Court takes notice that the statements were made but does not accept the truth of the matter asserted.

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)). A fact is not considered reasonably in dispute "if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Khoja*, 899 F.3d at 999 (Fed. R. Evid. 201(b)(1)–(2)). Thus, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quotation marks and citation omitted). However, "a court cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

The Court takes judicial notice of Exhibits 19 and 20 to show that Defendants Woodman and McGee sold their shares pursuant to a 10b5-1 plan. Plaintiffs do not contest that the stock sales were pursuant to a 10b5-1 plan. Further, an email referencing the 10b5-1 plan is in the Amended Complaint. *See Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018) (taking judicial notice of Form 4 filings because "Plaintiffs rely in part on Stoppelman's 'suspicious' stock sales to argue that Defendants made the allegedly fraudulent statements with scienter. Defendants counter that the Forms 4 reflect that Stoppelman's sales were

11

made pursuant to a Rule 10b5-1 plan adopted prior to the alleged fraud, and these Forms 4 reflect that. . . . Courts in this circuit have routinely taken judicial notice of Forms 4 to determine whether insider stock sales raise an inference of scienter to support a § 10(b) action.").

However, the Ninth Circuit requires courts to identify which aspects of a document is being judicially noticed. *Khoja*, 899 F.3d at 1002. For these reasons, the Court judicially notices Exhibits 19 and 20 for the purposes of showing that Defendant Woodman and Defendant McGee had nondiscretionary 10b5-1 stock sales plans.

Exhibits 3, 4, 8, 9, and 10 are a series of press releases which were not incorporated in the Amended Complaint and are not particularly relevant to the issues presented here. Exhibits 12, 13, 14, 15, and 16 are earnings calls and a press release from outside the class period, which were not relevant to the motion at bar. These exhibits provide sales from outside the class period, which are not relevant to the Court's decision. Exhibit 18 is a screenshot from GoPro's website showing GoPro did not lower the price of all of its cameras, this Exhibit is similarly of minimal relevance. Exhibit 21 is an SEC filing used to show Defendants provided a companywide message public to investors. The Court judicially notices this document only for the purposes of showing that the information was conveyed to investors, but not for the truth of the matter asserted.

B.  Legal Standard

When this Court evaluates a motion to dismiss for failure to state a claim upon which relief can be granted, it must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). However, in order for Plaintiffs to survive a 12(b)(6) motion to dismiss, they are required to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

United States District Court
Northern District of California

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for 'any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (quoting 15 U.S.C. § 78j(b)) (internal quotation marks omitted). "To plead a claim under section 10(b) and Rule 10b–5, the Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b–5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners, LLC*, 552 F.3d at 990. "Under the PSLRA, to properly allege falsity, a securities fraud complaint must now 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th Cir. 2012) (quoting 15 U.S.C. § 78u–4(b)(1)) (marks of omission in original). "The PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id.*

C.  "Puzzle Pleading"

Defendants argue that Plaintiffs' long stretches of quotes and repetition of nearly identical generalized conclusions amounts to "puzzle pleadings" and that alone justifies dismissal. Mot. at 7 n. 4. "In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires

13

a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *5 (N.D. Cal. Mar. 29, 2013). However, Plaintiffs' Amended Complaint is not "so unruly that it is difficult for [Defendants] to determine which allegations support which claims or to properly formulate an answer to the complaint." *Facciola v. Greenberg Traurig, LLP*, 781 F. Supp. 2d 913, 921 (D. Ariz. 2011), *aff'd*, 593 F. App'x 723 (9th Cir. 2015).

While Plaintiffs' complaint does string together long passages of quoted text, the complaint is not so deficient that Defendants are incapable of figuring out what statements are alleged to be false. Plaintiffs emphasize the portions of quoted text that they allege to be false or misleading. Furthermore, Plaintiffs set forth the reasons why they believe each statement is false or misleading, even if it is repetitive. Despite the fact that the Amended Complaint is hard to follow, it is not so deficient as to amount to puzzle pleading.

D.   Falsity

1.   HERO5 Black

Plaintiffs make a number of challenges to Defendants' statements regarding the HERO5 Black and promotional efforts to drive demand. During the Q3 Earnings Call, Defendants claimed that the HERO5 Black was "beginning to benefit from a series of marketing initiatives engineered to drive demand during the holiday season." AC ¶128. Similarly, Defendants described sales of the product as exhibiting a "bit of softness", and that "while that's to be expected given that the launch was totally dedicated to HERO6, and HERO6 ended up stealing HERO5's thunder, we think that we're going to be able to drive a substantial demand for HERO5 as promotional programs kick in this month." *Id.* ¶ 134. Nevertheless, because of the "dedicated promotional programs" Defendants felt "good about driving demand for that product and its contribution to our growth and profitability targets for the quarter." *Id.*

Plaintiffs explain that these statements are false and misleading because "the 'marketing initiatives' cited by Defendant Woodman included lower prices that Defendants knew, based on previous experience, had a negative impact on revenue." *Id.* ¶ 129. Further, they assert that those

same marketing initiatives "at no time benefited the HERO5 Black, a holdover item from 2016 with generally weak demand." *Id.* Similarly, as with nearly all of the allegations of falsity, they claim that the forecasting "failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues", and "GoPro was not on track to achieve the financial results it had let the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.*

When a claim of falsity is based on information and belief, a plaintiff must state all facts that form the basis for that belief. *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x at 950. Plaintiffs do not explain the basis for their belief that it was false to claim that the products were beginning to benefit from marketing initiatives. None of the CWs make such an assertion, and Plaintiffs have not pled any other evidence to support the contention that the products were not beginning to benefit from marketing initiatives.

The only facts alleged in this regard show that after the Defendants made statements about the prospects for the HERO5 Black, GoPro experienced a weak holiday season which led to the company failing to meet those projections. This amounts to at most fraud by hindsight. *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) ("Plaintiffs do not offer anything other than conclusory assertions to suggest that Microsoft was indeed sitting on an inventory of five million tablets during the Class Period or that Microsoft regarded or should have regarded its then-held inventory as worrisomely large. Absent such facts, Plaintiffs' theory of the case represents a classic example of impermissible fraud by hindsight, a type of pleading that the PSLRA was specifically directed at eliminating.").

Further, it is Plaintiffs' contention that in December 2017, after Defendants made the allegedly false or misleading statements, they discounted their flagship products "in an attempt to create demand." AC ¶ 37. Plaintiffs allege that Defendants knew that lowering the price would negatively impact revenue. However, they do not explain the basis for believing that the marketing initiatives then described by Defendants were price cuts, nor do they explain their basis for believing that when the statements at issue were made, Defendants intended to cut prices after

the disastrous Black Friday.  None of the CWs provide information supporting Plaintiffs' claim of falsity on this issue.

Plaintiffs do not allege facts supporting that at the time Defendant Woodman made the above statements, the HERO5 was not actually beginning to benefit from the marketing initiatives. Plaintiffs cannot rely simply on the fact of Defendants' ultimate failure to meet projections subsequent to the statements at issue.

### 2.    HERO6 Black

#### a.    Strong Sales Performance

Plaintiffs take issue with Defendants' statements related to the HERO6 Black's strong sales performance.  They argue that the following statements are false and misleading: "[a]verage sales price (ASP) increased by 22% year-over-year and 3% sequentially . . . driven by the strong performance of the premium priced HERO6," AC ¶ 123 (alteration in original); "HERO6 Black launched on September 28 . . . with strong sales execution and a 93% channel fill rate at retail," *id.*; "Initial sales of our premium-priced HERO6 Black are solid." *Id.* ¶ 128.  Plaintiffs contend these statements were false and misleading because the HERO6 Black had insufficient technology to generate sales, it was priced poorly, and demand for it was weak. *Id.* ¶ 129.  In nearly all of Plaintiffs' allegations of falsity, they claim "Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues[.]" *Id.* ¶ 129.

Plaintiffs allege that the sales were not actually "strong" or "solid."  However, Defendants' statements describing sales as strong or solid amount to mere puffery.  "Various circuit courts, including the Ninth Circuit, have held that vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortg. Holdings, Inc., Sec. Litig.*, 554 F.Supp.2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Ent., Inc. v. Tektronix*, Inc., 352 F.3d 367, 379 (9th Cir. 2003). "When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. . . .  Indeed, 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *In*

16

*re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting *VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993). Courts have recognized there is a distinction between "definitive positive projections" and claims of "excellent results" or "significant sales gains." *See also Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("The 'mere puffery' rule has been interpreted to include 'statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.'"). *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (citing *Grossman v. Novell, Inc.* 120 F.3d 1112, 1119 (10th Cir. 1997). Describing sales as "solid" or "strong" are as vague as statements about "excellent results."

To the extent Plaintiffs argue that the actual sales numbers (*e.g.*, regarding percentage increase in sales or claimed fill rate) produced were false, they have no factual allegations to establish falsity. Plaintiffs do not allege the numbers were false. CW5 did claim that Defendants used crude and simplistic programs to determine sales forecast and that they did not receive Amazon or Best Buy sales in a timely manner.[1] AC ¶ 116–118. Yet, CW3 contradicts this contention. The Amended Complaint states "Defendants closely tracked product demand and sales." AC ¶ 83–84. Specifically, it states "CW3 explained that GoPro kept close tabs on sales and consumer demand for its products through internal computer database systems that tracked all sales." *Id.* ¶ 83. For these reasons, the Court cannot find that Plaintiffs have alleged facts to support their argument that channel fill rate and percent increase statements were false.

      b.    <u>Upgraders</u>

Plaintiffs assert that the following statement was false or misleading: "Our paid campaigns for the holiday quarter, which focuses on HERO6 . . . is now in full swing. Another important metric we track is the number of HERO6 purchasers who are upgrading from a previous generation GoPro. Internal data from our applications show that approximately 30% of those who purchased HERO6 in the first three weeks following launch also owned either a HERO4 or

---

[1] Reliance on these simplistic programs does not rise to the required level of scienter under the PSLRA. *See* Part II.E.

HERO5.  If you include all GoPro models, we believe the percentage of upgraders to be higher. ***We're excited about this healthy mix of new users and upgraders***.”  AC ¶130 (emphasis in original).  The highlighted portion indicates the passage Plaintiffs allege is false or misleading.

Plaintiffs contend the bolded statement was misleading because: “Defendants’ priorities had not led to strong execution and results and Defendants had not ‘reestablished GoPro’s business as growing and profitable’ given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products”; “demand for the HERO6 was weak, largely due to its high price tag, a fact that was confirmed when GoPro slashed prices on the HERO6”; “customers were not responsive to GoPro’s incremental upgrades, which prompted the Company to slash prices on its flagship camera products in late 2017”; “GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts.”  *Id.* ¶ 131.

In this case, Plaintiffs focus on the specific claim that Defendants were excited about the new users and people upgrading as fraudulent.  However, “‘mildly optimistic, subjective assessment[s]’ about particular aspects of a company do not amount to a securities violation.” *Juli-Yang Hong v. Extreme Networks, Inc.,* 2017 WL 1508991, at *13 (N.D. Cal. Apr. 27, 2017) (quoting *Oregon Pub. Employees Ret. Fund*, 774 F.3d at 604).  A similar claim that a company was “extremely excited about the prospects for Lenovo” and a company referring to an acquisition “as tremendously positive” has been found to be non-actionable.  *Id.*  Plaintiffs’ vague statements regarding their excitement do not rise to level of actionable fraud.[2]

c.    Comparisons of HERO4 to HERO6

Plaintiffs contend that two of Defendants’ answers to questions during the Q3 Earnings Call on November 1, 2017, which compared the HERO6 to the HERO4, were false and misleading.  The two responses were:

- “<Q - Yuuji Anderson [of Morgan Stanley on Earnings Call]>: Great, thanks for taking

---

[2] Plaintiffs allege no facts demonstrating that the stated 30% figure was false.

my question. I was hoping if we could get some additional color on HERO6 sell-through. Is there a way to kind of compare this to, say, what you saw with the HERO4 Black? I believe that was your other $499 product. Is there any comparison there?"

"<A - Brian McGee>: There's some. ***Actually, from a percentage perspective, the HERO6 Black is doing substantially better than the HERO4 Black. Out the gates, HERO4 Black was about 20%, selling about 16% of sell-through in the fourth quarter of 2014 and we're seeing substantially better than that on the HERO6 Black***." AC ¶ 141.

- "<Q - Ben J. Bollin>: Thanks for taking the question. Brian, on the commentary on the HERO6 Black, you talked about the sell-in mix being higher. How would you say the initial sell-through read has been for HERO6 Black in the month of October versus the new product in the year ago period? …." "<A - Brian McGee>: On the HERO6, well, the HERO5 the sell-through, it's kind of hard to compare, because one is a $399 price point, the other is $499. But I can say we've been – ***the HERO6 Black sell-through has been quite good as we've commented before. Comparing to our HERO4 Black, which was the same price point, we're doing much better at that price point than the HERO4 Black did, so I think you've got to kind of take it from that perspective***." AC ¶149.

Plaintiffs argue that the bolded statements comparing the HERO4 to the HERO6 are false and misleading because: "demand for the HERO6 Black was weak, largely due to its high price tag;" *Id.* ¶¶ 142, 150; "the HERO6 Black's new technology was insufficient to differentiate it from previous models and thereby boost sales;" "the HERO6 Black's excessive pricing in a crowded field where its cheaper predecessors were still readily available ensured that it would not drive consumer demand;" "Defendants' direct comparison of the HERO4 to the HERO6 failed to account for the market saturation and product cannibalization unique to the HERO6 and negatively affecting sell-through;" "Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and" "GoPro was not on track to achieve the financial results it

had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.*

However, Plaintiffs do not appear to contend the statement that the HERO6 Black outperformed the HERO4 was literally false. To the extent that Plaintiffs argue that it is literally untrue that the HERO6 Black outperformed the HERO4, there is no factual allegation to support that contention in their Amended Complaint.

Plaintiffs' allegations regarding the comparison between the HERO4 and the HERO6 fail for several reasons. To begin with, the documents Plaintiffs rely on as the basis of their Amended Complaint show that in fact the "HERO6 Black was selling well and meeting expectation." Bafus Decl. Exhibit 7 at 1. Plaintiffs do not allege facts showing that, at the time the statements were made, the HERO6 was not performing well. At most, Plaintiffs rely on testimony from CWs 1, 2, and 3. But CW1 and CW2 both left the company prior to when these statements were made and before the HERO6 Black launched. While CW3 alleges that the failed sales performance of "Black Friday 2017 provided confirmation that GoPro was far off track for its sales targets," *id.* ¶ 89, CW3's statement does not show that at the time the statements were made, it was known that sales were off track. The disastrous Black Friday occurred after the statements were made.

### 3. Karma

Plaintiffs contend that the following statements made on November 1, 2017 about GoPro's Karma Drone are false and misleading: "*GoPro's drone, Karma, was the #2 selling drone in the U.S. priced $1,000 and above during the six months ending September 2017, according to the NPD Group's Retail Tracking Service*." AC ¶ 123. Plaintiffs further contend that Defendants response in the Q3 2017 Earnings Call was false and misleading where "Defendant Woodman responded to a query from Stanley Kovler of Citi regarding bringing 'a potentially higher margin product to market'" *Id.* ¶ 143. On November 1, 2017, Defendant Woodman responded, "*We're still seeing a lot of strength in the $1,000 range price band for drones. And as we've shared in the past, GoPro's Karma drone is the number two best-selling drone in North America in the $1,000 and above price point. And I think when we first shared that we were high-teens, and we've actually grown share since then. So, Karma is serving as a terrific platform for us as we*

*further our own capabilities and value proposition for consumers with our next generation drone offerings. And the consumer feedback to Karma specifically, actual owners of Karma, has been quite good.  And so we're feeling really good about our prospects in the future there*." *Id.* ¶ 143.

Plaintiffs argue that the statements are false and misleading because: "demand for GoPro's Karma drones was weak given the bad publicity stemming from the recall as well as the Karma's lack of market recognition that had led the Company to consider a name change for the drone." *Id.* ¶ 124.  Similarly, "the Karma was not profitable"; the Karma "was subject to known trends and uncertainties with respect to research and development expenses, specifically its dependence on GoPro's camera business as [a] precondition to future viability." *Id.*  "Defendants had access to internal sales, marketing, and product demand data confirming weak demand for and unprofitability of the Karma, and for that reason cited outside sources with respect to the Karma's market share[.]" *Id.* ¶ 144.  "GoPro's drone division was jeopardized by demand and pricing problems affecting its camera sales;" "Defendants' marketing approach was not 'deliberately constrained', but instead reflected the aforementioned lack of demand;" "the possibility that GoPro would have a 'next generation of drone offerings' was in jeopardy given that Karma was highly dependent on the success of GoPro's highly troubled camera division for future investment and development;" "Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and" "GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.*  Finally, Plaintiffs allege the statement is misleading because "GoPro never released actual numbers on market share with respect to the Karma." *Id.* ¶ 58.

At the outset, the characterization that the consumer feedback to the Karma was "good" is non-actionable puffery.  "Good" is not an actionable statement that investors would rely on.  *See Wozniak*, 850 F.Supp.2d at 1036 (finding that the statement "so far we're getting really great feedback" to be non-actionable puffery).  The statements about the Karma's good feedback are

21

just vague statements of corporate optimism. *See id.*

Plaintiffs do not contend that the Karma was not actually the second highest selling drone in that market; instead they argue that the statement is misleading because Defendants did not provide context for being the second most popular. They allege that the statements about Karma are misleading because they do not say how far behind the Karma is compared to the first most popular drone in the $1000 price range. However, based on documents judicially noticeable by the Court, (Bafus Decl. Exhibit 5 at 5), Defendants in fact identified the Karma's market share during the Q3 2017 Earnings Call. *See* Bafus Decl. Exhibit 5 at 5 ("According to NPD Group's Retail Tracking Service, among drones priced above $1,000 in the U.S., in Q3, GoPro's drone Karma held its unit share at 24%."). Plaintiffs fail adequately to allege the statements in question were false or misleading.[3]

4.    Session

Plaintiffs take issue with Defendants' statements regarding GoPro's Session camera: "***demand for GoPro's entry-level Session camera was much higher than anticipated and will result in a sooner than expected end-of-life for this product***. This limits our inventory at the entry-level price point during the quarter, but it identifies a significant opportunity for us to expand our market with a new entry-level product slated for 2018." AC ¶ 128. This statement was made on November 1, 2017. Plaintiffs also challenge Defendant Prober's response to a question from Joe H. Wittine of Longbow Research about "inventory evaporation" and the "holiday strategy": "***The good news is that with the entry-level price move on Session, we've shown that there's a real market at that price point. As we said on the call in 2018, we've got a new product to address that entry-level which we're even more excited about than Session because it's an even better form factor for that price point. So on the positive side, we see great***

---

[3] To the extent Plaintiffs contend Defendants were deliberately reckless in relying on poor forecasting systems, recklessness to be actionable under the PSLRA must be "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *DSAM Glob. Value Fund*, 288 F.3d at 389. That standard has not been met here.

*opportunity at that price point. Our guidance for this quarter reflects promotional programs, special edition SKUs and plans to bridge the gap between where we are today and that next product*." AC ¶ 139.

Plaintiffs claim these statements are misleading because: "Defendants would not 'stand pat at $299 as the low point', as Defendant Prober's response indicated, but planned to reduce the price of the Session further, to $199." *Id.* ¶ 140. "Defendants' 'entry-level price move' had reduced the costs of their products to the point of unprofitability." *Id.*

Plaintiffs do not provide an explanation for their belief that Defendants did not intend to keep the price for the Session at $299. At most, they rely on the fact that at a later point, Defendants lowered the price. The subsequent decision to lower the price later is not evidence that Defendants never intended to keep the Session's price at $299. The conclusory allegation amounts to no more than fraud by hindsight, generally rejected by the courts. *See Fialkov*, 72 F. Supp. 3d at 1230. Plaintiffs must provide some additional factual allegations beyond the fact of a price reduction one, especially where, as here, the company experienced a lackluster start of the holiday season and offered discounts on nearly all of their flagship products. AC ¶ 37. For these reasons, the Court cannot find Defendant Prober's statements about the Session camera to be false or misleading.

     5.    GoPro Generally

          a.    Restoring Growth

Plaintiffs assert that the following statements made in a press release issued on November 1, 2017 titled "GoPro Announces Third Quarter 2017 Results" were false and misleading: "***GoPro has turned a corner, restoring growth and profitability to our business*** . . . [;] AC ¶ 123: Defendant Prober also stated on the Q3 Earnings Call that the Company's priorities were "leading to strong execution and results and we've reestablished GoPro's business as growing and profitable." *Id.* ¶ 130. Later in the call, Plaintiffs argue the following passage included false and misleading statements: "our goal is to enter 2018 with a bang. I don't think that we're approaching the business in an overly conservative manner. I think that we've got very clear goals for 2018, which is to continue double-digit growth and profitability for 2018 as well. We're, as we

previewed a bit, we're excited about our new product roadmap for 2018, several new products planned. And I believe it's just a terrific continuation of the innovation and the focus on simplifying the consumer experience that has restored growth to GoPro this year. ***So overall, we're feeling really good about the job done in turning the company around this year and how it sets us up well for 2018, starting with our entry into Q1, thanks to our responsible management of Q4.***" *Id.* ¶ 135. On the same call, Defendant McGee stated "***Gross margins are trending up to 41% in the second half of 2017 due to our improved product offerings***. . . ." *Id.* ¶ 132. The press release went out on November 1, 2017, and the Q3 Earnings Call took place on the same day.

Plaintiffs contend that the bolded quotes amount to false or misleading statements because: "GoPro's drone division was jeopardized by demand and pricing problems affecting its camera sales;" "GoPro had not "turned a corner" or "restored growth and profitability to [its] business" given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products;" "Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues;" "GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.* ¶ 124. Further, they argue the statements are misleading because: "Defendants' priorities had not led to strong execution and results and Defendants had not 'reestablished GoPro's business as growing and profitable' given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products;" "customers were not responsive to GoPro's incremental upgrades, which prompted the Company to slash prices on its flagship camera products in late 2017;" (*Id.* ¶ 131) "Defendants had not 'turned the company around' in 2017 given the contemporaneous lack of demand and lack of market recognition that would soon manifest themselves in steep discounts to GoPro products;" *Id.* ¶ 136. Finally, they allege that Defendants had not been responsible, as they claimed to be. *Id.*

Plaintiffs have not provided context for the statements made in the phone call. Defendants

24

contend that "[t]o the extent that [these statements] can be read as statements of prior performance, the statements are demonstrably accurate – GoPro did return to profitability in Q3 – GAAP net income for Q3 was approximately $15 million, or $0.10 per share, up from a GAAP net loss of $104 million from the same quarter in the prior year." Mot. at 17 (referencing Bafus Decl. Exhibit 2). Defendants rely on GoPro's press release, which highlighted the sales figures supporting Defendants' contention that GoPro was returning to profitability. While this document is incorporated by reference, the Court cannot accept the truth of the contents of the document. Nonetheless, Plaintiffs fail to allege any specific facts showing that as of November 1, 2017, signs of profitability were in fact lacking.

Instead, Plaintiffs base their challenge on confidential witnesses. The Amended Complaint states: "During CW1's last few months at the Company, CW1 noted that the general trend of sales had been declining for eighteen (18) months or more." AC ¶ 60. However, as previously explained CW1 was only at GoPro for one month of Q3 2017 having left in July, 2017; thus, it is unlikely CW1 would have known whether GoPro was returning to profitability as of November 1, 2017. CW5 details failings at the Company including that "the Company often did not have complete sales numbers to analyze." *Id.* ¶ 116. However, the defects CW5 describes appear to relate to forecasting sales rather than providing quarterly revenue and profitability updates. *See id.* ¶ 118 ("When forecasting sales, CW5 said GoPro did not know what the current demand was on Amazon or Best Buy."). The facts provided by CW1 and CW5 do not contradict Defendants' statements that on November 1, 2017 gross margins were trending up, or that the Company had turned a corner towards profitability.

### 6. Guidance

Plaintiffs allege that Defendants made a number of false or misleading statements regarding their Q4 guidance released on November 1, 2017. Some of these statements are forward looking while others are mixed statements with forward looking and non-forward looking aspects.

#### a. Forward Looking Statements

Plaintiffs argue that the following forward-looking bolded statements were false and misleading:

- "*In the meantime, our guidance reflects promotional programs and special edition SKUs that we believe will get us to our target*." AC ¶ 128.

- "*We expect revenue for 2017 to be between $1.305 billion and $1.325 billion, which is double-digit growth of between 10% and 12% over 2016. We expect fourth quarter gross margins to be 41.5%, plus or minus 50 basis points, which puts annual margins between 38% and 39%*." *Id.* ¶132.

- "<Q - Joe H. Wittine>: Hey, thanks. Can you share with us some quant on how much you expect camera ASPs [Average Sales Price] to increase as the new mix is fully out in the wilds, let's say compared to calendar 2017's mix?" "<A - Brian McGee>: Yeah. Hi, Joe, this is Brian. As we've said, well, Q3 was $288, so that was up 22% year-over-year. *We expect Q4 actually to be close to $300 on ASP which would be a record. And if I look from 2017 to 2018, there would be somewhere between 2% to 5% growth in ASP based on the roadmap we're seeing*." *Id.* ¶ 137.

- "<Q - Mike Koban>: First of all, I just kind of wanted to make sure I understood the guidance for the fourth quarter. It looks like it's implying kind of a low double-digit decline year-over-year, but I was wondering if you could – I believe last year was a big sell-in year, so I was wondering if you could give us some – a little bit more color on kind of what this implies, or how you think about it as far as Q4 sell-in…." "<A - Brian McGee>: Yeah. Mike, this is Brian. The midpoint of the guidance would be down year-over-year in Q4 about 13%, but the fact is, for the whole – we look at the whole year, right? *So, for the whole year the guidance is up 10% to 12% on revenue growth. And actually the midpoint of our guidance on EPS is, to be profitable. So that's a pretty dramatic turnaround from 2016*. I think we should kind of point that out. We also were able, because of supply chain and kind of execution in the quarter for Q3, able to get more fill rate of HERO6 Black into Q3: and that pulled from Q4. So in fairness, you kind of have to look at almost the second half kind of together, Q3, Q4 where – and our guidance will be profitable as well on both a GAAP and non-GAAP basis in the fourth quarter and then profitable for the year. As far as channel

inventories go, we exited the fourth quarter of 2016 with about 14 weeks. And we want to be more like six weeks to eight weeks exiting this year. And so that's a pretty dramatic reduction in sell-in, in the quarter because we had to really work in the first quarter of 2017 to get that inventory move." *Id.* ¶ 145.

Plaintiffs assert that all these statements about the guidance are false and misleading because: "GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.* ¶ 129. Similarly, Plaintiffs contend that the "Q4 2017 guidance was directly at odds with internally known facts with respect to market recognition, product sales, and product demand, particularly as the contemporaneous lack of demand and lack of market recognition would soon manifest themselves in steep discounts to GoPro products." *Id.* ¶ 138. Furthermore, Plaintiffs argue that allowing analysts to believe that "GoPro's 4Q guidance was overly conservative was a result of Defendants' misrepresentations, when in reality Defendants knew, or recklessly disregarded, that its 4Q guidance was not conservative but was in fact unrealistic and unachievable given the facts known to Defendants at the time" was false and misleading. *Id.* ¶ 154.

The Q4 2017 guidance contains forward looking statements that fall within the safe harbor of the PSLRA. 15 U.S.C. § 78u-5. The PSLRA provides that a forward looking statement means "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor provision provides:

> a person ... shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity;[,] was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1).  The Ninth Circuit has recognized that the purpose of the safe harbor is to "protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events.  But the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts.  Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), *cert. dismissed sub nom. Quality Sys., Inc. v. City of Miami Fire Fighters' & Police Officers' Ret. Tr.*, 139 S. Ct. 589 (2018).  The Ninth Circuit has stated that earnings projections are "by definition . . . forward-looking statement[s]."  *In re Cutera Sec. Litig.*, 610 F.3d at 1111.  Further, forward-looking statements can be protected in two ways: "if they were identified as forward-looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading, under subsection (B)."  *Id.* at 1111–12.  "Under subsection (A)(i), however, if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *Id.* at 1112.

Plaintiffs challenge the cautionary language upon which the safe harbor may be predicated here for two reasons: first, they allege that the disclosures are essentially boilerplate, and second,

they argue that the disclosures are insufficient because Defendants knew that the "risks" had actually already transpired.

Where "broad cautionary language does not appear to provide any especially useful information" risk disclosures are inadequate for purposes of the safe harbor provision. *In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-KSC, 2018 WL 500990, at *4 (S.D. Cal. Jan. 22, 2018). For example, in *Illumina*, a court found that warning of a nearly constant occurrence demand changing with evolving product lines was insufficient for the safe harbor. *Id.* (contrasting its facts to those in *Cutera* "where the defendant identified a variable (sales force development and retention) whose occurrence or non-occurrence was uncertain and could affect results, the cautionary language here did not even identify a specific factor whose occurrence or non-occurrence was unknown."). The disclosures here are not boilerplate. The disclosures cover a wide range of possible risks and are detailed and extensive.

The risk disclosures quoted in the Amended Complaint:

> The success of new product introductions depends on a number of factors including, but not limited to, timely and successful research and development, pricing, market and consumer acceptance, the effective forecasting and management of product demand, purchase commitments and inventory levels, the availability of products in appropriate quantities to meet anticipated demand, the management of manufacturing and supply costs, the management of risks associated with new product production ramp-up issues, and the risk that new products may have quality issues or other defects or bugs in the early stages of introduction. In addition, the introduction or announcement of new products or product enhancements may shorten the life cycle of our existing products or reduce demand for our current products, thereby offsetting any benefits of successful product introductions and potentially lead to challenges in managing inventory of existing products. Failure to complete product transitions effectively or in a timely manner could harm our brand and lead to, among other things, lower revenue, excess prior generation product inventory, or a deficit of new product inventory and reduced profitability.

AC ¶ 159. Similarly, the additional risk disclosures for Q4 2017 10-Q read:

> We expect to derive the substantial majority of our revenue from sales of cameras, mounts and accessories for the foreseeable future. A decline in the price or unit demand for these products, whether due to macroeconomic conditions, competition or otherwise, or our inability to increase sales of these products, would harm our business and operating results more seriously than it would if we derived significant revenue from a variety of product lines and

United States District Court
Northern District of California

services. In particular, a decline in the price or unit demand of our top-selling HERO5 and HERO6 Black cameras or our inability to increase sales of these products, could materially harm our business and operating results.

*Id.* ¶ 161. These are the just the quoted passages in the Amended Complaint, read in their entirety, the risk disclosures are in fact even more extensive. Bafus Decl. Exhibits 2, 11.

The Ninth Circuit has found similar disclosures to be sufficient for the safe harbor coverage. For instance, the court has found the following cautionary language sufficient: "[T]hese forward-looking statements are subject to a number of risks and uncertainties, some of which are outlined below. As a result, actual results may vary substantially from those anticipated by the forward-looking statements. Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are: the volume and timing of systems sales and installations; length of sales cycles and the installation process; the possibility that products will not achieve or sustain market acceptance; [followed by fifteen more "important factors"]." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017), *cert. dismissed sub nom. Quality Sys., Inc. v. City of Miami Fire Fighters' & Police Officers' Ret. Tr.*, 139 S. Ct. 589 (2018). *See also Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017) (recognizing the following cautionary language as sufficient for the safe harbor provision: "'If our sales during the holiday season fall below our forecasts, our overall financial condition and results of operations could be adversely affected,' 'If we fail to effectively manage new product introductions, our revenue and profitability may be harmed,' 'The success of new product introductions depends on a number of factors ...,' '[I]f we do not successfully manage product transitions, especially during the holiday shopping season, our revenue and business may be harmed,' '[A]ny shortfall in expected fourth quarter net sales, due to macroeconomic conditions, product release patterns, a decline in the effectiveness of our promotional activities or supply chain disruptions, or for any other reason, could cause our annual results of operations to suffer significantly,' and 'our ability to accurately forecast demand for our products could be affected by other factors.'").

Hence, the issue here is not the specificity of the cautionary language, but whether Defendants failed to disclose risks that had already materialized, thus failing to meet subsection

(B) of the Safe Harbor. As noted above, subsection (B) requires knowledge of falsity.

i. Scienter

Plaintiffs claim that Defendants' cautionary language was inadequate because "Defendants' warnings about the risks of reduced demand for GoPro's products did not disclose that those risks had already materialized. While Defendants warned that the introduction of new products or product enhancements *may* reduce demand for existing products . . . they failed to reveal that they knew that this risk of decreased demand had already materialized with respect to the HERO5 and HERO6." Opp. at 13. Essentially, they allege that Defendants knew that the statements they made were false and misleading, even if forward-looking, because they knew the risks had already materialized (i.e., scienter). Cautionary language is not adequate where "[a] warning that identifies a potential risk, but 'impl[ies] that no such problems were on the horizon even if a precipice was in sight,' would not meet the statutory standard for safe harbor protection. If a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated, then, as the Second Circuit explained, its cautionary language would be inadequate to meet the safe harbor standard." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104 (D.C. Cir. 2015) 102–03 (internal citations omitted).

Plaintiffs rely on CW2 and CW3 for their assertion that risks identified in the cautionary statement had already materialized. However, as previously explained CW2 was not present when the HERO6 launched, so it is unclear how CW2 could have known, *e.g.*, that Defendants knew that demand for the HERO6 would be low at the time the statements were made. Further, CW3 states that "sales results for Black Friday 2017 provided confirmation that GoPro was far off track for its sales targets." AC ¶ 89. Again, Black Friday occurred *after* the statements were made. CW3 does not provide any facts showing a *prior* understanding of anticipated performance problems which were "confirmed" by Black Friday.

Plaintiffs further allege Defendants must have known that their pricing strategy would fail because "[i]n light of their experience with the HERO4 just two years earlier, Defendants knew that their pricing strategy with respect to the HERO6 and HERO5 would be unsuccessful, and that

dramatic price reductions would be required in order to spur sales." Opp. at 13 n. 14. However, the Court cannot find a sufficient basis for such an inference of scienter, based on the fact that GoPro had once before – two years prior – applied a similar pricing strategy that failed. The facts of each transaction and surrounding circumstances are not alleged to be sufficiently similar so as to support such an inference. *Cf. Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931–32 (N.D. Cal. 2017) (rejecting a similar argument to Plaintiffs because "the Court also agrees with Defendants that Plaintiff fails to allege facts showing Defendants knew at Session's launch on July 12, 2015, that it could not meet its Q3 2015 guidance announced nine days later, or that Defendants knew GoPro's September 28 price reduction was already so unsuccessful that GoPro could not meet its Q4 guidance announced in October. See ECF No. 100 at 14–15. It is not obvious that Session had already collapsed to the point Plaintiff implies. GoPro had spoken publicly about Session's struggles by October 28, 2015, and the Q4 guidance was, accordingly, disappointing. Thus, the cautionary language could apply to warn of further deterioration from that point forward.").

Plaintiffs allegations fail for the additional reason that the Amended Complaint does not allege specific factual allegations as to the finances and sales performance of the Company at the time the statements were made. These statements, at most, show that GoPro employees were underwhelmed by its new product offerings; however, employees' personal opinions about the new technology does not support the inference that Defendants knew that GoPro's guidance was false. *See Id.* at 929 ("Plaintiff has not alleged facts that would show Defendants had actual knowledge that GoPro's guidance was false or could not be met when issued.").

For the reasons stated herein, Plaintiffs have failed to show that the risk factors identified in the cautionary statement had already transpired, and Defendants, in making the challenged statements, knew of such facts and knew the guidance was unachievable.

### b. Mixed Statements

Plaintiffs allege mixed statements are false and misleading for the same reasons as the forward-looking statements. However, "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*,

Plaintiffs contend that certain of the mixed statements listed below are not protected by the safe harbor provision.

- "***Our expected results for 2017 are in line or better than the goals that were established at the beginning of the year; double-digit revenue growth, operating expense reduction, and a return to non-GAAP profitability. We're also pleased that our revenue split between Q3 and Q4 is much better than in prior years. As we look ahead, we will continue to drive operating efficiencies across the business with a focus on improved profitability and cash generation.*** As discussed last quarter*, **our operational improvements related to the launch of HERO6 drove third quarter performance and we have intentionally constrained inventory purchases in order to both enable double-digit revenue growth and to exit 2017 with low inventory***. Careful stewardship of our business during the holiday quarter positions GoPro for continued success in 2018." *Id.* ¶ 132.

Plaintiffs contend that this statement is false or misleading because "Defendants' marketing approach was not 'deliberately constrained', but instead reflected the . . . lack of demand." *Id.* ¶ 133. This contention is conclusory. As previously explained, Plaintiffs have failed to allege that at the time the statements were made on November 1, 2017, GoPro's products were in fact suffering from a lack of demand rather than deliberately constrained incentives. Nor do they contend that the revenue split between Q3 and Q4 were not better than in prior years. Plaintiffs do not specifically allege in their complaint that this particular statement is false. *See* AC ¶ 133. For this reason, Plaintiffs failed to allege the falsity of the above passage.

Moreover, the forward-looking statements presented herein describing "expected results" and looking ahead to drive operating efficiencies are exactly the types of statements the Safe Harbor provision intended to protect. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(F) ("The term 'forward-looking statement' means – (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital

33

structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer[.]"); *see also* Wozniak, 850 F. Supp. 2d at 1038 (applying safe harbor to statements such as "'[o]ur goals in 2007 are straightforward' and include 'extending the GP-focused ClinAdvisor product features and functionality'"). Defendants' plans for improved profitability and financial projections are examples of forward-looking statements protected by the Safe Harbor. As previously explained, the future expected projections and goals for improved profitability were accompanied by meaningful cautionary language.

- Defendant Woodman's Response to a question from Paul Coster (a participant in the third quarter earnings call): "<Q - Paul Coster>: …. The initial outlook for 2018 looks pretty good. The fourth quarter's though a little complicated, maybe a little difficult to understand. *It sounds like you have HERO5 inventory – excess inventory in the channel and you want to get rid of it. At the same time you're looking to sustain this margin improvement. I'm just wondering what the trick is for sort of flushing that inventory out and entering 1Q with the right mix in the channel.*" "<A - Nicholas Woodman>: Hi, Paul. Nick here. Yeah, thanks. *We're actually feeling really good about our guidance for Q4. We're really excited about how the year's turning out and that – as Brian noted, we're either meeting or exceeding most of the metrics that we laid out at the beginning of the year, of course most notably double-digit revenue growth and profitability, profitability coming a little bit earlier than anybody expected in Q3, which is a solid win for the team. So I'd just like to acknowledge that.*" *Id.* ¶ 134.

Plaintiffs do not provide any specific reasons for why the non-forward-looking aspects of the above statement were false or misleading. Plaintiffs do not specifically allege that statement about the Q3 results (including Defendants' contention that they achieved double digit revenue growth, profitability, and exceeding most of the metrics) was false at the time the statement was made. Instead, Plaintiffs simply restate the conclusory allegations that demand for HERO products was weak and the internal forecasting was not equipped to provide accurate projections.

*Id.* ¶ 136. For these reasons, Plaintiffs fail to sufficiently allege the non-forward-looking aspects of this passage were false.

### 7.    Focused on Consumer Demand

Plaintiffs assert that the following statement about shifting focus onto consumer demand is false and misleading: "During the quarter we generated $47 million in cash and gross margins were 40 percent. Year-over-year, we grew revenue by 37 percent and dramatically reduced operating costs without impacting our product roadmap. We launched our premium priced HERO6 Black ***with global on-shelf availability and strong critical acclaim. We are now focused on driving consumer demand to reach our goal of full-year double-digit revenue growth and non-GAAP profitability***." AC ¶123. Plaintiffs also claim the statement "***We are now focused on driving consumer demand and sell-through of our premium products to achieve our goal of full year non-GAAP profitability and exit the year with responsible inventory levels***" was similarly false and misleading. *Id.* ¶ 128.

Plaintiffs provide the following explanation for the statements' falsity: "the HERO6 Black's excessive pricing in a crowded field where cheaper predecessors were still readily available ensured that it would not drive consumer demand"; "demand for GoPro's Karma drones was weak given the bad publicity stemming from the recall as well as the Karma's lack of market recognition that had led the Company to consider a name change for the drone"; "GoPro's drone division was jeopardized by demand and pricing problems affecting its camera sales[.]" *Id.* ¶ 124.

As previously explained, vague statements of corporate optimism are non-actionable. *In re Impac Mortg. Holdings, Inc., Sec. Litig.*, 554 F.Supp.2d at 1096. With respect to allegations to the non-forward looking claim that GoPro achieved "strong critical acclaim," these statements are non-actionable puffery. *See Wozniak*, 850 F.Supp.2d at 1036 (recognizing "so far we're getting really great feedback" as non-actionable puffing). As to the statements about focusing on driving consumer demand to reach state goals, Plaintiffs do not claim Defendants were not in fact focusing efforts to drive such demand. Nor do they allege that at the time of the statement on November 1, 2017, it was impossible for GoPro to reach double-digit growth.

8.     Seasonality

Plaintiffs argue that the following statements about "seasonality" and boosted sales in the holiday season are false and misleading: "***Seasonality***. Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe." AC ¶ 155.  GoPro claimed that it "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season." *Id.* ¶ 156.  GoPro similarly stated that "[f]ourth quarter revenue comprised 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively' – so always more than 25% of annual revenues and sometimes nearly 50%." *Id.* (alterations in original). GoPro also claimed that it "anticipate[d] that this seasonal impact [was] likely to continue." *Id.* (alterations in original).

Plaintiffs claim these statements are false and misleading because: "(i) their holiday season strategy included lower prices that Defendants knew, based on previous experience, would likely have a negative impact on revenue; (ii) Defendants' holiday season price reductions would reduce the costs of their products to the point of unprofitability; (iii) Defendants' internal controls and forecasting processes either failed to account for GoPro's lack of sales and/or demand, or, alternatively, Defendants recklessly turned a blind eye to these issues; and (iv) GoPro was not on track to achieve the financial results it had led the market to believe it was on track to achieve during the Class Period and its Q4 2017 guidance was directly at odds with internally known facts." *Id.* ¶ 157.

Plaintiffs do not allege that Defendants did not in fact generally see the highest revenues in the holiday season; nor do they allege Defendants did not have their highest quarter in the fourth quarter.  Plaintiffs have also failed to allege Defendants in fact did not expect seasonality, a statement of relative performance, would not occur in 2017.  For these reasons, the statements related to GoPro's general success in the holiday season were not false or misleading.

9.     Sarbanes Oxley

Plaintiffs also make an argument that the Sarbanes Oxley disclosures were false and

misleading. This is a derivative claim. As none of the other claims survive, this claim similarly fails.

E.    Scienter

Not only is Plaintiffs' Amended Complaint deficient with respect to its factual allegations related to falsity, but they also fail to meet the heightened pleading standards for scienter.

A "plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate [section 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4 (West). The term scienter for the purposes of 10(b) "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 182, 193 n. 12. As noted above, Plaintiffs' assertion of a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 314. A strong inference of scienter means that a plaintiff must show that "the defendant [ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991.

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc, Ltd.*, 551 U.S. at 314. "In determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 336. "We have held that reckless conduct can also meet this standard to the extent that it reflects some degree of intentional or conscious misconduct, or what we have called deliberate recklessness." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (internal

37

quotation marks omitted).

The Ninth Circuit Court of Appeals has instructed that "confidential witness statements cannot be used to demonstrate scienter unless: (1) the confidential witnesses are described with sufficient particularity to establish their reliability and personal knowledge; and (2) the statements which are reported by confidential witnesses with sufficient reliability and personal knowledge are themselves indicative of scienter." *Zucco Partners, LLC*, 552 F.3d at 995.

### 1. HERO5 Black

Plaintiffs allege that Defendants statements that HERO5 Black was beginning to benefit from marketing initiatives and that they think they can drive demand for the product were false and misleading. None of the CWs provide factual allegations that at the time the statements were made, Defendants knew that the HERO5 Black would not benefit from marketing initiatives, nor did they allege that Defendants in fact knew at the time that they would not be able to drive demand. One of the first signs of a problem in sales was on Black Friday which occurred after the statements. Scienter for the comments related to the HERO5 Black has not been established.

### 2. HERO6 Black

With respect to the HERO6 Black, CW1 and CW2 were not present when the HERO6 Black launched, but nevertheless claim that they knew the technology would not drive demand. The complaint does not sufficiently establish their reliability and personal knowledge sufficient to show Defendants' scienter at the time of their statements. While CW2 was aware of the technological features that would be incorporated into the HERO6 Black before CW2 left the company, it is unclear how CW2 would have knowledge that Defendants' knowingly made false statements about demand for the HERO6 when the product launched after CW2's exit.

CW3, as previously explained, contends that the disastrous Black Friday confirmed that GoPro would not meet expectations generally, and explains that the failed Black Friday was a result of poor pricing of the HERO6. However, CW2 does not provide factual allegations that Defendants knew that demand for the HERO6 product was poor when the statements were made prior to Black Friday.

For the same reasons, the CWs do not provide factual allegations that Defendants knew

they were not actually excited about the mix of new users and upgraders, nor do the CWs provide explanations that Defendants knew at the time of the statements that comparing the HERO4 and the HERO6 was misleading.

### 3. Karma

As explained previously, the statements related to the Karma drone were in fact true, non-misleading statements. Both CW1 and CW2 provide explanations for how the Karma was a failing product, but they do not show that Defendants knowingly made false or misleading statements; in fact their statements about their product were true.

### 4. Session

Plaintiffs contend that Defendants statements that they would stand pat their price point on the session was false or misleading; however, not one of the CWs references Defendants' plans to change the price point when Defendants made the statements. Plaintiffs fail to establish scienter for the statements related to this product.

### 5. GoPro Restoring Growth

Plaintiffs rely on CWs saying that Defendants attended meetings about demand products to show that their statements that they knew that GoPro was not restoring growth and profitability. However, the allegations are too conclusory to establish Defendants knew their statements were false or misleading when they were made. CWs do not provide information about what information was shared in these meetings or at what point Defendants knew that demand was weak or the growth had stalled. There are no specific allegations about the timing of what Defendants knew and when they knew it. Again, there is insufficient evidence of Defendants' scienter.

### 6. Guidance

Plaintiffs contend that Defendants knew the guidance was false and misleading. In the present case, CW5 indicates Defendants knew that the Q4 projections were based on crude and simplistic analysis and because of delayed sales from Amazon and Best Buy there was no way to know what the demand was for Amazon and Best Buy. AC ¶¶ 113-118. Plaintiffs have pled sufficient factual allegations to show CW5 would be in position to have reliability and personal

knowledge relating to the inadequacy of GoPro's analytical tools. Unlike *Zucco Partners v. Digimarc Corp.*, where "[s]ome of the confidential witnesses were simply not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter," CW5 here was a Senior Data Analytics Engineer managing the information that eventually became the forecasts. *Zucco Partners, LLC*, 552 F.3d at 996–97. However, CW5's statement falls short of asserting scienter as the Complaint only states that "Defendants Woodman and McGee were presented reports from manual Excel spreadsheets that were generally used to project future sales." AC ¶ 114. There is no allegation that Defendants knew that the analysis was so crude and simplistic so as to render reliance on the forecasts unreasonable. Furthermore, there is no indication that Defendants knew that the Amazon and Best Buy reports were coming in significantly delayed. *Id.* ¶¶ 116-118.

Plaintiffs rely on *Hatamian v. Advanced Micro Devices*. There the Court found that because a CW noted that Defendants were intimately involved in any production issue and attended weekly meetings about production and the statements were corroborated by other CWs, Defendants must have known of the production issues. *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015). That is not the case here, as CW1, CW2, CW3, and CW4 do not allege with similar specificity facts establishing Defendants' knowledge.

To be sure, "allegations may conceivably satisfy the PSLRA, without particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. *S. Ferry LP, No. 2*, 542 F.3d at 786. However, even if it would be absurd to assume that Defendants would not know that Amazon and Best Buy sales numbers were delayed and did not know that their sales analysis was crude and simplistic, the complaint fails to establish "deliberate recklessness" necessary to establish scienter under the PSLRA. *See id.* at 782 (recklessness can establish scienter but only "to the extent that it reflects some degree of intentional or conscious misconduct," or what we have called "deliberate recklessness."). "Recklessness is: a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading

40

buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002). In *DSAM Glob. Value Fund*, the court noted, "It is alleged that the auditor egregiously failed to see the obvious—that according to Generally Accepted Accounting Principles ('GAAP'), millions of dollars in revenue from software sales reflected in a financial statement should not have been recognized. We hold that the complaint sets out a compelling case of negligence—perhaps even gross negligence—but does not give rise to a strong inference that the auditor acted with an intent to defraud, conscious misconduct, or deliberate recklessness, as is required in a securities fraud case." *Id.* In the case at bar, relying on crude and simplistic models may have been negligent or even grossly negligent, but it does not amount to deliberate recklessness for the purposes of the PSLRA's standard for scienter.

The allegations fail to establish scienter.

### 7. Suspicious Stock Sales

Plaintiffs also allege that Defendants' stock sales support an inference of scienter. "'[U]nusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter. . . ." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 938 (9th Cir. 2003) (quoting *Silicon Graphics*, 183 F.3d at 986). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (finding at least a question for the jury regarding scienter where "[m]ost of the individuals sold 100% of their shares, with the lowest percentage being 88%).

However, "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1056–57 (N.D. Cal. 2018). "The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter." *Id.* at 1057 (N.D. Cal. 2018) (quoting *Wozniak v. Align Techs., Inc.*, No. 09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011)). "The Ninth Circuit has instructed that a strong inference of fraudulent intent may occur when an insider 'owning much of a

company's stock make[s] rosy characterizations of company performance to the market while simultaneously' selling large percentages of his holdings." *City of Royal Oak Ret. Sys. v. Juniper Networks*, Inc., 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (quoting *Lipton*, 284 F.3d at 1036–37).

Even a single digit percentage sale of stock can provide an inference of scienter if "[t]he timing of the sale" is unusual and Defendant "had not sold any shares for at least the prior several years. *Batwin v. Occam Networks*, Inc., No. CV 07-2750 CAS (SHX), 2008 WL 2676364, at *15 (C.D. Cal. July 1, 2008). However, where a defendant could have sold more stock, or if a defendant substantially increased its stock holdings during a class period, there is no strong inference of scienter. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012), *aff'd,* 561 F. App'x 598 (9th Cir. 2014).

In the present case, Defendant Woodman and Defendant McGee engaged in a small non-discretionary stock sale. This does not give rise to a strong inference of scienter. The sales were made shortly after the allegedly fraudulent statements were made. AC ¶ 119. On November 16, 2017, Defendant McGee sold roughly ten percent of his stock. *Id.* ¶ 120. Between November 3 and November 7, 2017, Defendant Woodman sold approximately 2% of his stock. Opp. at 23. Here, the allegations concerning the Individual Defendants' stock sales do not support a strong inference of scienter. Not only were the amounts relatively small, but the sales were made pursuant to a 10b5-1 plan. *See City of Royal Oak Ret. Sys.*, 880 F. Supp. 2d at 1069 (finding that where Defendant "made only one sale during the entire Class Period—a sale of 32,000 shares on November 8, 2010—that constituted a mere 2% of his total holdings. Meanwhile, all of the sales by Defendant . . . during the Class Period were non-discretionary sales made pursuant to a Rule 10b5–1 trading plan, which [was] created prior to the Class Period. This innocent, alternative explanation for the stock sales negates an inference of scienter."). In this case, the innocent alternative explanation that the sales were from a non-discretionary 10b5-1 plan negates scienter. Hence, the more cogent and compelling inference is that the stock sales were made pursuant to a 10b5-1 plan, and thus the sales do not adequately allege scienter.

F.      Section 20(a)

For a section 20(a) claim, Plaintiffs "must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners, LLC*, 552 F.3d at 990. As Plaintiffs' underly claims fail to adequately plead a cause of action under section 10(b), the Court dismisses Plaintiffs' section 20(a) claim.

### III.      CONCLUSION

As this is the first motion to dismiss, the Court hereby **GRANTS** Defendants' motion to dismiss without prejudice. Plaintiffs shall file a second amended complaint no later than 45 days from the date of this order.

This order disposes of Docket No. 76.

**IT IS SO ORDERED**.

Dated: March 15, 2019

_____
EDWARD M. CHEN
United States District Judge